Donald Melvin POTTER, a Minor, and Robert Preston Potter, a Minor, by Their Next Friend, Mildred Potter, Plaintiffs-Respondents,

SAC–OSAGE ELECTRIC COOPERATIVE, INC., Defendant-Appellant.

No. 47547.

Supreme Court of Missouri,

Division No. 1.

April 11, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied May 9, 1960.

Lynn M. Ewing, Jr., Ewing, Ewing, Ewing, Carter & Wight, Nevada, Mo., for appellant.

Foust & Lyons, and Walter A. Raymond, Kansas City, for respondents.

WESTHUES, Judge.

Plaintiffs Donald Melvin Potter and Robert Preston Potter, minors, by their next friend, Mildred Potter, filed this suit to recover damages for the death of their father, Melvin Potter. In the petition, it was alleged that the death was caused by the negligence of the defendant Sac-Osage Electric Cooperative, Inc. A trial resulted in a verdict for plaintiffs in the sum of $25,000. From the judgment entered, the defendant appealed.

Defendant, in the brief, contends that the deceased Melvin Potter was guilty of contributory negligence as a matter of law. Other points briefed have to do with instructions given by the court.

The evidence introduced at the trial justifies the following statement of facts: Preston Potter, brother of the deceased, lived on a farm in Cedar County, Missouri. The defendant had constructed a line to Preston's home and was furnishing electric current for general use at the farm. A neighbor of Preston desired to be served with electricity by the defendant company and made application therefor. To accommodate the neighbor and the defendant, Preston gave permission for an extension line to be built from his home to the home of the neighbor. To reach the neighbor's home with electric service, it was necessary to construct a line from Preston's home to the neighbor's across Preston's farm. This line was constructed about April, 1956.

Preston testified that a representative of the defendant came to his place to determine where the poles should be set and the line constructed; that he showed defendant's agent the spot where he intended to construct a Butler grain storage bin; that this bin was to be within a few feet of and similar to a bin that had been previously constructed. He further testified that the proposed line was to be above this new bin; that defendant's representative, Evan Neely, and he (Preston) talked about that. Note Preston's evidence:

"Q. Go ahead and tell the rest of the conversation you had with Evan Neely? A. We went back up by the old oak tree and I had some gravel and rock piled there, a load of gravel, and Evan wanted to know if I was going to build something and I said: 'Yes, I want to build another steel bin.' He said it would be all right to go ahead because they would have to put taller poles on each side from where we was standing by the steel bin, because it was across my driveway and around where my machinery was stored; that they would have to be taller poles so it would be safe enough.

"Q. You mentioned a pile of rock and a pile of gravel—exactly where was the pile of rock? A. The pile of rock was right in the center of where I built this second bin, grain bin."

The new bin was constructed in early June, 1956. On the tenth day of June, Preston and his father, Ray Potter, moved an elevator to the new bin intending to use it to convey barley into the bin for storage. On the following day, the barley was to be harvested. This bin, called a Butler bin, constructed of metal, was round, about 14 feet in diameter, and 8 feet in height to the eaves. Above the eaves there was a dome-like top. At the top of this dome, cone, or slope, was a flange around an opening or hole 18 inches in diameter. Around this opening was a circular body about 4 to 6 inches high, having the appearance of a stove pipe. Witnesses in their evidence often referred to this stove-pipe like extension as a cone. The grain to be stored therein was to be conducted to the top of this cone by an elevator where it would be dropped into the bin through the opening of this cone. The Potters' elevator had no down spout so, to keep the grain from going over the opening and "to bump the grain down in the bin" through the cone as it left the elevator, the Potters attempted to place a piece of tin, about 5 feet in length and about 2 feet wide, partially in the cone so as to make a backstop to force the grain into the bin. Preston, using a ladder, climbed upon the bin with a piece of tin and a wire to fasten the tin to the cone. While he was standing on the flange at the top of the bin, he crimped the tin to place it in the cone and then in some way he flipped the wire around the cone and as he did so, it came in contact with the "hot" wire of the defendant company, causing Preston to be thrown from the bin. He was taken to a hospital where he recovered. Evidently he was not seriously injured. Defendant's wire which carried over 7,000 volts was about 6 feet above the bin. The lower wire was about 3 feet above the bin. The wires, one above the other, were only 6 inches from a line flush with the edge of the hole at the top of the bin.

The next morning, Melvin Potter, the deceased, who lived in the neighborhood went to Preston's (his brother's) place where he, Melvin, and his father attempted to arrange matters so the barley could be harvested and the grain stored in the bin. Melvin's father, who had helped Preston the day before and had witnessed what happened to Preston, informed Melvin what had occurred. No one in the Potter family seemed to have known much about electricity. Melvin and his father, so the evidence showed, conceived the idea of placing some rubber around the lower wire and tying it back away from the bin. They did not know that this wire was harmless. After the lower wire was tied

back, Melvin, with the same piece of tin that Preston had had the day before, climbed on top of the bin, stood on the flange next to the cone or opening, crimped the tin so it would fit in the round opening of the cone, lifted it above the cone, and, as he was about to place it therein, he evidently received a shock of electric current and he fell from the bin. Members of the family who were present went to him and found that he was dead.

Looking on and watching Melvin while he stood on the bin were his father, his wife, and Preston's wife. Melvin had been told by his father that Preston had been knocked from the bin the day before because the piece of wire he had in his hand had touched one of the electric wires. That was the reason Ray Potter and Melvin decided to pull the lower wire away from the bin and to tie it back out of the way. The father testified as follows:

"Q. Which wire was it that you were going to tie back? A. Well we didn't know which was the hot wire but we tied the bottom wire back.

\* \* \* \* \* \*

"Q. Did you do anything else besides put the rubber over the line and then tie something on the end of the rubber to pull the bottom line back? A. Well we cut a few limbs off of the tree there so we could get it back out of the way.

\* \* \* \* \* \*

"Q. Then after you had tied this bottom wire back then what did you do? A. Well, Melvin got the tin and ladder up and went up on the top there to put the tin in the place.

\* \* \* \* \* \*

"Q. As he went up the ladder and up toward the top of the bin what were you doing? A. I was just watching him, telling him to be careful and be sure and not touch that wire.

\* \* \* \* \* \*

"Q. Will you describe Melvin's movements from the time he got to the top of the ladder up to the cone? A. Well he went right on up to the cone and got his tin straightened out and just dropped it in the cone there and about that time there was something that clicked and he turned and just fell off of there.

\* \* \* \* \* \*

"Q. Will you just tell this jury what you did with respect to watching Melvin and the tin as he walked up to this cone and as he started to put the tin in the hole? A. I just watched the top of the tin as he went up to be sure that he didn't get noways near that wire with it.

"Q. Did you watch the top of the tin continuously? A. Yes, sir.

"Q. Did you ever at any time from the time that Melvin started up toward the cone until the time you heard the click and saw him fall off, see the tin touch any line? A. No, no, it never did touch.

"Q. What is the closest, based upon your observation, that that tin ever came to that power line, the one that hadn't been moved? A. I'd say a foot anyway."

On cross-examination, he testified:

"Q. You decided that the way to do this was to tie the bottom wire back? A. We didn't know which was the hot wire so we just tied the bottom wire back, we could get to it easiest and that would give us room—the other wire was above where we wanted to put the tin anyway.

"Q. You didn't know which wire was hot? A. No.

"Q. You didn't know which of these lines had caused the injury? A. No."

Maxine Potter, wife of Preston, testified as follows concerning what she witnessed:

"Q. As he went up that ladder and up that roof exactly what were you doing? A. I was watching the piece of metal he had in his hand to see that it didn't touch the wire.

"Q. Did you watch it constantly from the time he started up the ladder until he got up to the cone? A. Yes, sir.

"Q. Did you ever at any time take your eyes off of him? A. No, sir, I did not.

"Q. Now, will you tell the jury in your best judgment how far the top of the piece of tin was from this high-line wire that had not been moved when you heard the crackle and saw the light? A. Oh, it must of been 8 to 12 inches—eight inches to a foot I'd say.

"Q. Is that your best judgment? A. It would be my best judgment.

"Q. At no time did you take your eyes off of that piece of metal from the time he started up the building? A. No, sir.

"Q. What were you out there for? A. To watch to see that he didn't get into that wire.

"Q. After you saw the flash and heard the crackle what happened to Melvin? A. He just straightened up, looked down at his wife, stepped backwards and fell off of the building."

Mildred Potter, wife of the deceased, told what she saw as follows:

"Q. Mildred, try to go ahead and tell the jury exactly what you saw him do with the tin? A. I remember he crimped the tin with the end toward him with the outside edges out and he set it on the edge of the bin or the top of the hole and I was standing there looking all the time and I saw that flash of fire come down from the upper line.

"Q. Did you watch that piece of tin continuously from the time he went up on the roof until he got up to the top? A. Yes. That's what I went out there for.

"Q. You say that's what you went out there for? A. Yes.

"Q. Did the piece of metal or tin Melvin was holding ever touch this top power line? A. It did not."

Plaintiffs introduced evidence that an electric current may jump or "arc" from 8 to 12 inches depending upon conditions; that under the conditions present at the time Melvin Potter was killed, an electric current could well have passed between the power line and the piece of tin held by Melvin without actual contact.

The defendant introduced evidence that, absent actual contact, electric current will not pass from a high voltage line to a metal object more than $\frac{1}{4}$ or $\frac{1}{2}$ inch to 1 inch away; that if contact is made and the metal is drawn away a flash may be visible for a space of 2 or 3 feet.

Witnesses for plaintiffs and witnesses for defendant who were acquainted with safety rules governing construction of high voltage lines agreed that the lines should be at least 20 feet above driveways and the lowest line should be 8 feet above any building such as the bin in question; further, that a "hot" wire should be 12 feet above a building. In this case, the line charged with electricity was only 18 feet above the driveway. The lower line was only 3 feet above the bin and the upper, or charged, wire was only 6 feet above the bin.

In the circumstances, as shown by the facts in this case, we are of the opinion that the question of whether Melvin was guilty of contributory negligence was a question of fact for a jury to decide. See Green River Rural Electric Co-op. Corporation v. Blandford, 306 Ky. 125, 206 S.W.2d 475, loc. cit. 478–480(5) (6) (7), and cases there reviewed.

The Potters certainly had the right to assume that the defendant's agents, being acquainted with the dangers of electricity, would construct the power line so as not to endanger human life. 29 C.J.S. Electricity § 54, p. 609. The defendant had knowledge of the fact that the line constructed would be over a grain bin where men were required to be at work. Furthermore, defendant should have known that men unacquainted with electricity and its dangers would be required to work in dangerous proximity to the wire charged with current.

In the reply brief, defendant says that plaintiffs, in the argument of their brief, made no reference to the injury Preston sustained on the day before Melvin was killed. We shall not overlook this fact. Preston evidently was injured when a wire he was holding came in contact with the upper live wire. His father testified that as Preston flipped the wire to get it around the cone there was a flash and Preston fell from the bin. It was in evidence that the wire Preston had was burned, indicating contact. The Potters, Melvin and his father, in view of that experience concluded, so the evidence shows, that it would be safe if no contact was made with the power line wires. The lower line was tied back. Melvin did not carry a wire in his hands when he was on the bin. The witnesses testified that the tin Melvin was preparing to place in the cone of the bin at no time came in contact with the upper line. There was evidence that an electric current could arc or jump from the charged line to a metal object even if no contact was made. There was a dispute as to the distance an arc could be formed. It is evident that the occurrence of the day before caused the Potters, including Melvin, to be very cautious while attempting to place the tin in the cone of the bin.

Defendant also says, in the reply brief, that the Potters could have, after Preston was injured, called the defendant at Eldorado Springs for help; that not having done so, they were negligent. Ray Potter, the father, when asked why he did not call the defendant, answered: "We figured they put it where they wanted it and we didn't have nothing to say about it." In the circumstances, that was not an unreasonable conclusion. The defendant knew at the time the line was constructed that a bin was to be built at the place where it was later constructed. A portion of the foundation, that is loose rock, was there at the time defendant's agents built the line. Nothing had occurred since the line was built that the defendant did not know. The conditions were not changed. So, the conclusion of the Potters that it would be useless to call the defendant was not unreasonable. Had the Potters telephoned defendant, they could not have told the company anything the company did not know about the construction of the power lines.

Defendant has cited a number of cases where courts have held parties injured by electricity guilty of contributory negligence as a matter of law, such as State ex rel. Kansas City Light & Power Co. v. Trimble, 315 Mo. 32, 285 S.W. 455, 49 A.L.R. 1047; Hamilton v. Laclede Elec. Co-op., Mo., 294 S.W.2d 11; Coleman v. North Kansas City Elec. Co., Mo., 298 S.W.2d 362; Gladden v. Missouri Public Service Company, Mo., 277 S.W.2d 510, and others. In State ex rel. Kansas City Light & Power Co. v. Trimble, supra, a 14-year old boy was killed when he climbed a pole and grasped a live wire. This court en banc held the boy was guilty of contributory negligence.

In the Hamilton case, supra, high voltage wires were located over a pump house. The wires were at a height required by safety rules. Plaintiff and her husband drew a 31-foot-long pipe, a part of the pump equipment, from the ground and it came in contact with a high voltage wire, causing injury to plaintiff. At the time plaintiff was injured, about 25 feet of pipe was above the top of the pump house. The pipe, to make contact with the wire, had to lean to the south about 12 feet. There

the court held plaintiff had been guilty of negligence on the ground that no precaution was taken to avoid contact with electric wires. The pipe was jointed at 12-foot intervals and could have been disjointed.

In the Coleman case, supra, an experienced electrician was injured while working atop a transformer. This court held that he was guilty of contributory negligence because he unnecessarily took a position that was obviously dangerous. In the Gladden case, supra, the plaintiff, an adult, was injured when he climbed a tree to retrieve a parakeet and while attempting to capture the bird, he came in contact with a high voltage wire. In that case, this court held plaintiff's contributory negligence was rightly submitted to a jury. A jury found for the defendant. The above cases may be distinguished from the case before us for the reason that the facts and circumstances were not similar.

In the case before us, it was necessary for Melvin Potter to work with caution to place the tin in the cone of the bin. The high voltage wire was only 6 feet above the bin. The piece of tin was 5 feet long. To place it in the cone, he had to lift it above the cone. The electric wires were only 6 inches from a line flush with the edge of the cone. We are of the opinion that the facts of this case are such that the ruling made in the case of Lebow v. Missouri Public Service Company, Mo., 270 S.W.2d 713, loc. cit. 716, 717(5), is applicable. In that case, high voltage wires were so located in an apple orchard that at some points the wires were only a few feet from trees. Lebow was injured when a metal ladder he was using in picking apples came in contact with an electric wire. We quote from the Lebow case since what the court there said may well be applied to the case before us: "The evidence was such that a jury reasonably could have found that decedent was guilty of negligence which barred plaintiff's recovery. The jury reasonably could have found that Gerald failed to exercise ordinary care for his own safety

commensurate with all the facts and circumstances in evidence. We may not say, however, that reasonable men might not fairly reach different conclusions on the evidence viewed most favorably from plaintiff's standpoint. We therefore, may not declare as a matter of law that plaintiff's decedent was guilty of contributory negligence. We are of the opinion that the trial court properly left that question to the jury. Thompson v. City of Lamar, 322 Mo. 514, 534, 17 S.W.2d 960, 968(4)." See also Davis v. Missouri Electric Power Co., App., 88 S.W.2d 217, loc. cit. 221(4) (5); 29 C.J.S. Electricity § 53, p. 605. We rule that the trial court was right in submitting the question of contributory negligence to the jury.

■ Defendant contends that instruction No. 1, authorizing a verdict for plaintiff, "assumed negligence under the above circumstances; and that the jury was thereby left to speculate and conjecture on the question of negligence." Under this same point, defendant says instruction No. 5 did not require a finding of proximate cause. We cannot agree. Instruction No. 1, in submitting the case to the jury, hypothesized certain facts which the jury was required to find in order to return a verdict for plaintiffs. A portion of the instruction (omitting hypothesized facts) reads as follows: "And the Court further instructs you that if you believe and find from the evidence in this case * * * and that in erecting said uninsulated electric service wire in such proximity to the top of said grain bin as to endanger persons lawfully thereon defendant was negligent, if you so find, and that as the direct and proximate result of such negligence said Melvin Potter was electrocuted and killed; * * *." It is apparent that the jury was required to find negligence and proximate cause before a verdict for plaintiffs was authorized. Defendant cites Donnelly v. Goforth, Mo., 284 S.W.2d 462; Banta v. Union Pac. R. Co., 362 Mo. 421, 242 S.W.2d 34, and other cases. We find no ruling in the cases contrary to our conclusion in this case. De-

fendant admits the evidence showed negligence on part of the defendant. In fact, defendant's evidence established negligence in the manner the electric line was constructed. However, the jury was required to find both negligence and proximate cause. The point is ruled against the defendant.

 Under three points, defendant complains of instruction No. 5, which reads as follows: "You are further instructed that the court does not mean to assume as true or established any of the matters mentioned or referred to in the instructions, but leaves you to determine from the evidence whether or not such matters have been established as facts by the evidence." In the case of Greenwood v. Wiseman, Mo., 305 S.W.2d 474, loc. cit. 476, 477(1), this court considered an instruction which was identical with the one now before us. The instruction in the Greenwood case had been given at defendant's request and the plaintiff contended it was erroneous. This court there approved the instruction. It is unnecessary to belabor the point. What was there said applies to this case.

Defendant complains of instruction No. 4 wherein the court informed the jury that it was defendant's duty "to exercise the highest degree of care usually exercised by careful and prudent persons engaged in the same or similar business * * *." It is claimed that this instruction "is misleading, confusing, and injects collateral matters not in evidence into the jury's deliberations." It is said that no evidence was introduced to show in what manner electric lines were usually constructed. We find that defendant's witnesses testified as to the safety rules applicable to all persons engaged in constructing and maintaining electric power lines. The point is therefore without merit. It is also said that the instruction "was only an abstract statement of defendant's duty which prejudiced defendant in that it misled and confused the jury." We cannot see how an instruction defining the highest degree of care and informing a jury that it was defendant's duty

to exercise such care tends to confuse or mislead a jury. This court en banc ruled in State ex rel. Berberich v. Haid, 333 Mo. 1224, 64 S.W.2d 667, that such an instruction was "a fair statement of the law and is not a mere abstraction." See 64 S.W.2d loc. cit. 669, 670 (9–11).

We have considered all of the points briefed and find that we are not justified in setting aside the verdict and judgment in this case.

The judgment is hereby affirmed.

All concur.