**MISSOURI POWER & LIGHT COMPANY, a Corporation, (Plaintiff) Respondent,**

**v.**

**E. P. BARNETT, Keith W. Major, Gladys M. Major, Robert J. Major and Edith E. Major, (Defendants) Appellants.**

No. 48677.

Supreme Court of Missouri,

Division No. 1.

Feb. 12, 1962.

Motion for Rehearing or for Transfer to Court en Banc Denied March 12, 1962.

William A. Seibel, Jefferson City, for appellants.

J. D. James, Jefferson City, Robert L. Hawkins, Jr., Graham & Hawkins, Jefferson City, for respondent.

HYDE, Judge.

Action for establishment of rights under an easement for an electric transmission line, seeking an injunction against encroaching upon plaintiff's rights. The court made findings of fact and conclusions of law in accordance with plaintiff's claim and entered a decree including a mandatory injunction requiring defendants to remove a house constructed after this suit was commenced. Defendants alleged in their answer and had evidence to show the relief asked and granted would cause loss to them of more than $16,000.00, which is sufficient to show jurisdiction in this Court. State ex rel. Sims v. Eckhardt, Mo.Sup., 322 S.W.2d 903, 905.

In 1929, plaintiff obtained a right-of-way easement "to erect, maintain and operate a line of steel towers and wires with necessary anchors, guys and braces upon and across certain lands owned by the grantor," the center line of the right of way being described in the deed. This conveyance further stated: "There will be only three towers on the above described

centerline. The easement hereby granted includes the right to transmit electrical energy over said line and to enter upon said premises for the purpose of erecting said steel towers and supports and stringing said wires and repairing or removing the same, and the right to trim or remove such trees as interfere with said line." It further stated that acceptance by the grantee "shall obligate it to pay any damages, which may be caused to crops and fences from the construction and maintenance of said steel tower line; said damages, if not mutually agreed upon, to be ascertained and determined by three disinterested persons," and stated how they should be selected.

The court made the following findings of fact, which are fully supported by the evidence:

"1. Plaintiff, a public utility company, pursuant to authority granted by the Public Service Commission of Missouri, constructed an electric transmission line from Jefferson City, Missouri, to Mexico, Missouri, in the latter part of 1929, and the line has been operated and maintained in its original location at all times since its erection. That said electric transmission line is an integral part of an electric production and transmission system serving a wide area in Missouri. The line is constructed of steel towers, each of which has three steel cross-arms from which are suspended six electric conductors of aluminum with steel cores. Three conductors on each side comprise a circuit operated at a voltage of 69,000 volts. A seventh wire, known as a shield wire, is stretched between the tops of the towers and serves to protect the line from damage by lightning.

"2. Defendants are the owners of Lot One (1), Block B, Section Two (2), of Jordan Hill's Subdivision to the City of Jefferson, Cole County, Missouri, and are the successors in title of the grantors of an easement to plaintiff for the erection, maintenance and operation of the electric transmission line, and said defendants acquired the above described real estate with actual and constructive notice of the existence of said easement of plaintiff across said lot.

"3. In April of 1929, prior to the erection of the transmission line, plaintiff for the consideration of $150 secured a right-of-way easement across a farm owned by defendants' predecessors in title. The line was constructed along the center line described in the easement and has remained in the original location at all times since its erection. That said grantors of the easement owned in excess of 100 acres at the time of the grant, all of which at that time was devoted to agriculture. There were no buildings or structures of any kind near or under the transmission line. In September, 1956, a subdivision was plotted, which included the lot in question here now owned by defendants. The corporate limits of Jefferson City were extended to include the portion of the transmission line and the defendants' property in question here. In 1955 some residential development began east of said line, but no construction was attempted which directly involved the transmission line until defendants constructed a dwelling house directly beneath all of the conductors of the line in 1958. None of the towers of the transmission line are located on the lot of defendants, but the conductors suspended from the towers pass directly across and over the lot of defendants. The clearance between the lowest conductor and the top of the roof of defendants' house is 17.83 feet.

"4. Said electric transmission line has five steel towers located south of the Missouri River [in Jefferson City]. The first tower next to the river, known as the Bluff Tower, and the fifth and last tower generally south thereof have insulators hung in what is known as the strain position, while the three remaining towers have insulators hung in the suspension position. Insulators hung in the strain position are required where the direction of the line is changed or the tension in the conductors of the line is changed. The fifth tower south of the Missouri River is the first

tower immediately south of defendants' lot. Any work on the conductors between the tower next to the river on the bluff and the fifth tower to the south requires the conductor or conductors between those two points to be lowered to perform said work. The transmission lines must be periodically inspected for both mechanical and electrical strength, and in order to accomplish such inspection it is necessary to have free access to the conductors and towers on the line. That maintenance is occasioned not only by conditions which occur in the conductors and towers, but also may be the result of outside forces such as wind, lightning, ice, trees, rifle fire and airplanes. That repairs or replacements of damaged conductors cannot be accomplished in the air above the surface of the ground, but such damaged conductors have to be spliced on the ground. That the conductors of this line are of such weight and are handled at such tension that mechanical and mobile equipment is required, and that in raising or lowering the conductors it is necessary to have free access to the surface of the ground immediately below the conductors in a straight line from tower to tower.

"5. That the presence of the house directly under the conductors of the transmission line adds the possibility that a fire in the house could cause damage to the conductors or even cause the conductors to break and fall, and that in fighting any fire in the house if a stream of water directed by firemen should touch any of the conductors or near them it would endanger the life of the person holding the hose. The possibility of any of the conductors for any reason falling across the house creates the hazard of igniting the house and possible harm to any occupant thereof."

Plaintiff's evidence was that this line was the most important link in its transmission system; that its original cost was more than a half million dollars; and that relocation would not only be costly but that no convenient location is available in the immediate vicinity. At the time the easement was granted the whole area of the transmission line was devoted entirely to agriculture. The corporate limits of Jefferson City, Missouri, were then some distance to the east. However, in 1947, the corporate limits were extended to include the still predominately agricultural area and included all but a small portion of the transmission line south of the Missouri River. The house in question (occupied by defendant Barnett) and two others were the only houses constructed or under construction, at the time this suit was commenced, on the 45 lots that defendants (who are contractors and developers) acquired in the area in January 1958. No other house had been or was being built anywhere under the line, which terminated farther southwest at a step-down substation (to reduce from 69,000 to 13,800 volts) to serve Jefferson City. Defendants own other lots over which plaintiff's line passes. It was admitted that the house could be moved and plaintiff's evidence showed a total cost of $5750.00 for moving and relocating.

In March 1958, defendant Barnett came to plaintiff's office and inquired of V. H. Anderson, its engineer supervising transmission lines, and "asked what we would do if he built a house under our line." Anderson told him "we would do everything we could to prevent it" but Barnett said "he was going to build a house under it." Anderson went to the Major brothers, defendants herein, upon finding they owned the land with Barnett to "dissuade them or influence them to dissuade Mr. Barnett from proceeding with the construction." They furnished him with plans for the proposed house and one of them indicated that he had tried to dissuade Barnett. Anderson arranged for frequent inspection to check for any activity at the site and found on Saturday, June 14, 1958, that footings for a building had been poured there. On Monday, June 16, 1958, plaintiff had a written notice served on defendants by the sheriff notifying them that this construction was "an interference with and trespass upon

the rights held" and that it was plaintiff's intention "to seek appropriate relief by injunction and payment of any and all damages." On Wednesday, June 19, 1958, Anderson found the foundation poured and the forms removed. Barnett said: "If you boys will come back in a day or two, we'll have the floor on this." This suit was filed that afternoon.

Defendants, in support of their claim of right to build the house directly under plaintiff's transmission line, mainly rely on Babler v. Shell Pipe Line Corporation (E.D.Mo.) 34 F.Supp. 10, in which there was an easement for pipe lines, telephone and telegraph lines. In that case there was no building over or under any of these lines. The easement authorized additional pipe lines to be laid, without limit as to number or location, the owner to be compensated by "the same consideration per lineal rod as that paid for first line." The easement gave the grantee (among other things) the right to "reconstruct, replace, renew, maintain, repair, operate, change the size of, and remove, pipes and pipe lines" and "to erect, maintain, operate and remove" the telephone and telegraph lines, "with rights of ingress and egress" for such purposes. It also contained a reservation for the grantor "to have the right to fully use and enjoy the above described premises, except as to the rights hereinbefore granted"; and it obligated the grantee "to pay any damages, which may arise to crops, timber, fences or buildings, of said grantor from the exercise of the rights herein granted," providing how damages should be determined.

The controversy arose because part of the land lying north of the two pipe lines constructed had become desirable for building lots and title examiners for prospective lot purchasers would not approve the title because of the indefiniteness as to location of lines. The defendant agreed the court could declare that any additional pipe lines should be laid south of the existing lines. However, as to limiting the future use to any certain number of lines or as to limiting the use of the surface, the court said:

"It is unfortunate that the lease is indefinite and uncertain in this particular. But it is likewise unfortunate from the plaintiff's standpoint that the easement is indefinite and uncertain as to the number of pipe lines that may be laid and the consequent disruption of the use of the surface. But these omissions may not be corrected by construction.

"The property owner, therefore, has the right to use the surface of the ground in any manner he sees fit so long as that use will not disturb, injure or destroy the pipe lines below the surface or the telephone and telegraph line above the surface. If he desires to erect a building or plant a crop on the surface of the ground adjacent to or even over the pipe lines there is nothing in the easement to forbid. Of course, if the landowner does so he will incur the risk of injury to those buildings, structures or crops from possible new construction and from repair or reconstruction of the existing facilities. But although the defendant possesses the right to enter upon the premises for the purposes stated yet the obligation to compensate for the injury caused from the exercise of that right likewise exists.

"It should be clear from what has been said that the court has no power or right to determine what portion of the surface of the tract the defendant may use to the exclusion of the property owner or vice versa. The property owner may use the entire surface subject only to the right of the easement holder to injure crops or structures thereon for the particular purposes stated and with the obligation to pay damages therefor."

Obviously, there are many differences between the situation in that case and this one. As noted the court was commenting generally upon the indefiniteness of the agreement as to rights of both parties and was not ruling a specific situation of

any kind of a building over the pipe lines. However, it did recognize that the owner had only the right to make uses of the surface that "will not disturb, injure or destroy the the pipe lines below the surface or the telephone or telegraph lines above the surface." Probability of disturbance and injury is involved here by reason of the fire hazard shown; and we have a very different situation because of the great and highly dangerous amount of electricity always carried on this line so close to the roof of the house. (For dangers involved see Hamilton v. Laclede Electric Cooperative, Mo.Sup., 294 S.W.2d 11; Potter v. Sac-Osage Electric Cooperative, Inc., Mo.Sup., 335 S.W.2d 192; Carey v. Crawford Electric Cooperative, Inc., Mo. Sup., 347 S.W.2d 184.) The Babler case did not consider this kind of a situation nor discuss interference with repairs and maintenance, such as were authorized by the easement herein involved (including necessary inspection) and shown by the evidence to be important for safety and for uninterrupted service. Furthermore, as the easement herein did not, the easement in the Babler case specifically mentioned buildings (providing for payment of damages to them) and contained an express reservation for the grantor "to fully use and enjoy" the described premises. Moreover, as noted in Ohio Fuel Gas Co. v. Sun Oil Co., (Ohio C.P.) 164 N.E.2d 922, the Babler case did not involve a public utility or its service. In Arkansas Louisiana Gas Co. v. Cutrer, La.App., 30 So.2d 864, the Babler case was distinguished by reason of the specific provision about damages to "buildings" in that easement. The court noted that in the easement before it (a pipe line case) the gas company was obligated only for damages to fences and crops (as in this case) and affirmed a judgment granting a mandatory injunction for removal of a building over the pipe line. The court found "that the construction and completion of the building was in violation of the rights granted the plaintiff under its right of way deed."

Likewise in Central Kentucky Natural Gas Co. v. Huls, Ky., 241 S.W.2d 986, 28 A.L.R.2d 621, in which a building was being constructed over a pipe line, the court said: "Obviously, to allow the construction of a building over this high power transmission line would be a burden upon the easement and an unwarranted violation of the rights created thereunder." Both of these cases stressed the necessity of inspection for proper maintenance and to prevent damage and injuries. An annotation to this case, 28 A.L.R.2d 626, 630, with cases summarized, shows that the broad general language of the Babler case has not been applied in specific instances of buildings, which cause interference and create hazards, where there is no reservation of full and complete use and ownership with specific mention of buildings. Therefore, we hold that the Babler case is not decisive of the issues herein involved.

The effect of a building under an electric transmission line was considered in Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 51 S.E.2d 191, 6 A.L.R.2d 194, where the court reversed a judgment in favor of a landowner's right to have a building under the line, saying: "Such a building, so located, would seem, necessarily to interfere with the exercise of the plaintiff's 'right of access upon and along said easement,' for purposes incident to the maintenance of its electric power transmission lines." The court further said: "When the servient owner of land subject to an easement for the construction over and upon it of electric power lines undertakes to erect, and does erect and maintain, a permanent building of the size, height, and dimensions shown by the uncontradicted evidence in this case, to hold the Power Company, the dominant owner, without adequate remedy to prevent this encroachment upon an easement lawfully acquired would seem to us to create an unwise precedent. A high degree of care is required of those who handle and distribute electric current, the degree of care being that commensurate with the dangers

reasonably to be apprehended from contact with so powerful and subtle an agency, and when a right has been conferred therefor its exercise in the interest of public safety and public service should not be hampered by permitting unreasonable encroachments upon or interference with the means and facilities it may lawfully use."

The court cited Collins v. Alabama Power Co., 214 Ala. 643, 108 So. 868, 46 A.L.R. 1459, in which the court said: "We think there can be no doubt that the dwelling house, resting in part upon complainant's right of way, is an obstruction such as complainant sought to guard against when it took a grant of its right of way from Evans." See also Kesterson v. California-Oregon Power Co., 114 Or. 22, 228 P. 1092; Willingham v. Georgia Power Co., 193 Ga. 801, 20 S.E.2d 83, (both of which concerned high piles of lumber) and Pacific Gas & Electric Co. v. Minnette, 115 Cal.App.2d 698, 252 P.2d 642; and Horky v. Kentucky Utilities Co., Ky., 336 S.W.2d 588; Louisiana Power & Light Co. v. Bennett, La.App., 107 So.2d 468; (in all of which there were mandatory injunctions for removal of buildings); see also Kansas City Power & Light Co. v. Riss, Mo.App., 319 S.W.2d 262; 29 C.J.S. Electricity § 16, p. 527. Our view is that the trial court correctly ruled in its conclusions of law that this house, "located directly beneath all of the conductors of the line * * * is an obstruction and an impediment to access to the space below the line for inspection of the conductors and for the movement of men, equipment and materials beneath the line in a straight line between the steel towers in making any required repairs on the conductors"; that "the presence of the house also adds the possibility of damage to the conductors by a fire occurring in the house, which of course would be a threat to the uninterrupted operation of the line"; that "the erection of the house by the defendants was and is a substantial encroachment upon the paramount easement rights of plaintiff and is inconsistent with the full use and enjoyment of the right-of-way easement of plaintiff for the operation and maintenance of said transmission line"; and that since the house was constructed "immediately under said transmission line after having been notified by plaintiff that it would interfere with its easement rights, and most of the house was constructed after this action was started, a mandatory injunction is the proper remedy for the removal of a permanent and substantial encroachment by defendants on plaintiff's right-of-way even though defendants will be put to heavy expense in moving the house."

The judgment is affirmed.

All concur.