432 So.2d 188 (1983)
Ronald W. KITZINGER and Delores V. Kitzinger, Appellants,
v.
GULF POWER COMPANY, Appellee.
No. AO-99.
District Court of Appeal of Florida, First District.
May 25, 1983.
*189 Stephen H. Echsner of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, Pensacola, for appellants.
Robert P. Gaines of Beggs & Lane, Pensacola, for appellee.
ROBERT P. SMITH, Jr., Chief Judge.
A corner of the Kitzingers' house in Pensacola, built in 1975 upon land they acquired that year in fee, extends 18.06 feet into a 100-foot wide electrical transmission line easement that Gulf Power acquired in the area, by recorded grant, in 1926. By this suit filed in 1981, Gulf Power sought a mandatory injunction for removal of the house or its offending corner. That the circuit judge denied. The proof was that moving the house would cost $77,000, more than its value, that remodeling the corner would cost $35,000, and that the house as built does not interfere with Gulf Power's past, present and now foreseeable use of the easement. At present the only improvements in the easement are several overhanging 115,000 volt conductors, or lines, about fifty feet from the house.
But the court found also that Gulf Power may one day wish to suspend other transmission lines within the easement nearer the Kitzingers' house. In that event, Gulf Power's witnesses testified, the house will encroach eight feet or more into the safety zone parallel to the conductors if they are conventionally hung, so requiring additional construction costs, estimated at $30,000 or more, to hang the conductors vertically instead of horizontally.
Wishing to avoid what the court plainly considered to be two bad choices  mandatorily enjoining the removal of a home that offers no immediate interference with Gulf Power's present and foreseen use of the easement, or blinking at what was considered a continuing encroachment upon Gulf Power's present legal rights and its future construction options, the court rendered a decision reminiscent of Solomon's offer, splitting the difference. The court imposed a lien in an unliquidated amount upon the Kitzingers' property, running with the land and "superior to the rights of the defendants, their heirs, grantees or assigns," to secure payment of the "additional construction cost that may be incurred in order to safely build a power line in view of the presence of the encroaching dwelling." The judgment provided that should Gulf Power wish to erect lines within the easement near the house, "it shall notify the then owners of the property ... of its estimate of the increased cost of construction required to avoid the encroachment," whereupon the owners shall either remove the encroachment or pay Gulf Power's additional construction cost. Failing that, the lien presumably would be judicially foreclosed.
From this judgment the Kitzingers appeal. Though we reject the Kitzingers' statute of limitations or laches defense, we give effect to undisputed evidence that the Kitzingers' house is no present interference with Gulf Power's beneficial use of its easement. The lien is unnecessary either to interrupt adverse possession under color of title or to preserve Gulf Power's right reasonably to use its easement in the future. Moreover, such a lien is improperly imposed upon a Florida homestead in the circumstances here present. We therefore reverse and remand for an award of nominal damages only.
The Kitzingers' brick veneer residence and home property front some 270 feet on Wymart Road. That frontage is one of two *190 essentially equal sides of a triangle having a 400-foot base, which is the rear property line. Gulf Power's easement, described in the grant by metes and bounds from a section corner about a half-mile distant, and evidenced on the ground by surveying monuments and tags on power poles near but not on the Kitzingers' property, intersects and crosses the property almost entirely within and parallel to its rear boundary, so covering half the depth of the triangular parcel, more than half its area, and a rear corner of the residence, as previously stated, to a depth of 18.06 feet.
Though Gulf Power's easement is wide enough if unimpeded to accommodate two parallel and independent sets of poles and lines, since 1926 the easement has contained but one set of poles with crossbars from which 115,000 volt lines are suspended. The half of the easement width nearer the Kitzingers' house has never been so occupied and most of it was not cleared and maintained to Gulf Power until 1977. According to Gulf Power's witness, there are no plans to erect new lines and poles within the easement either on the Kitzingers' property or elsewhere in the vicinity:
Q. And to your knowledge, Gulf Power has no plans to construct a transmission line in that area?
A. I don't know of any.
Q. How is the presence of the home interfering with your right to maintain the property?
A. I wouldn't say that it was, it would not interfere at this time.
Q. So the structure [the corner of the house], if it's in the easement is not interfering with your use of the easement?
A. Not at this time, no... .
Q. What type of harm will your corporation suffer if that home is not removed?
A. I could not say. I don't know.
.....
Q. Is the use of the property presently the same use that Gulf Power made of the property in 1926, sir?
A. At this time?
Q. Yes.
A. Yes.
Q. And are there any plans for increasing that use at this time?
A. Like I said, I don't know anything about the planning stage. I know if we continue to grow in that area it will be utilized at some date, but I don't know of any plans at this time.
Q. Has the presence of the Kitzinger home prevented adequate ingress or egress from the easement?
A. No.
Q. Has the presence of the Kitzinger home ever endangered any of the workers on the easement?
A. No.
Q. Has the presence of the Kitzinger home ever interfered with Gulf Power's ability to transmit electricity to its customers?
A. No.
The Kitzingers' statute of limitations or laches defense is that Gulf Power's action, not for trespass but on the case, was barred four years after Gulf Power had notice in 1975 of the offending structure. Secs. 95.11(3)(p), 95.11(6), Fla. Stat. (1981).[1] Gulf Power counters by citation to section 95.12, which provides that an "action to recover real property or its possession" may be maintained within seven years after "the person seeking recovery ... was seized or possessed of the property... ." The Kitzingers' reasoning overlooks that their house is a continuing encroachment upon the easement. Gulf Power's citation to section 95.12 also misses the mark conceptually; *191 as owner of an easement only, a right of user superior to that of the servient fee owners but not exclusive of their title or possessory rights, Gulf Power is not now and was never "seized or possessed" of the property in the sense prescribed by section 95.12. See the authorities collected in Florida Power Corporation v. McNeely, 125 So.2d 311, 315-16 (Fla. 2d DCA 1960), cert. den., 138 So.2d 341 (Fla. 1961).
Gulf Power's easement rights are continuous until terminated if at all by the underlying fee owners' continuous possession of the land, adverse to Gulf Power and exclusive of its easement rights, for the requisite period, which is seven years.[2] Sec. 95.16, Fla. Stat. (1981); see also Mumaw v. Roberson, 60 So.2d 741 (Fla. 1952). Gulf Power's action within seven years after the house was built, therefore, cannot have been barred regardless of whether the Kitzingers' possession was sufficiently adverse to and exclusive of Gulf Power's interest in the land to have satisfied the statute.
Though the period for adverse possession cannot have run, the central question of Gulf Power's present right to have the house removed, or to receive some other immediate remedy, is akin to if not the mirror image of the inquiry whether the Kitzingers' possession in the easement is sufficiently adverse to extinguish the easement pro tanto if continued unchecked for the period of the statute. For as owners of the servient estate the Kitzingers have possessory and user rights in the land notwithstanding the easement, and their exercise of those rights cannot either be actionable by Gulf Power or sufficiently adverse to extinguish the easement unless the Kitzingers' possession, whether under a claim of right or not, was clearly inconsistent with Gulf Power's easement. Doubtless there may be actionable cases of interference with an easement by means other than the character of the servient owner's possession of the land, but this is not such a case.
That correlation of the easement owner's right of action to enjoin interference, and the servient owner's adversity of possession under a claim of right, is as stated in 3 Powell, The Law of Real Property ¶ 424 (1981):
Since the servient tenant, as long as he does not interfere with the right of user, may use his land in any manner he desires, an act which serves to start the prescriptive period in his favor must be one clearly wrongful as to the owner of the easement. This requires that the use of the land by the servient tenant must be one which is incompatible or irreconcilable with the authorized right of use. Thus, the erection of permanent structures, such as building or walls, or other obstructions seriously interfering with the right of use, are sufficient to extinguish the right. The erection of fences or gates, however, is often compatible with the continued use of an easement, and thus is not adverse... . Where the dominant owner abstains from use of the easement, the servient owner, in the exercise of his privilege to use his own land in any manner he desires not interfering with the exercise of the easement, has an enlarged scope of privileged action. It is, therefore, under these circumstances more difficult for him to establish the adverse character of his behavior. Unless his conduct is actionable by the dominant owner, it cannot base a prescriptive extinction of the easement. (Footnotes omitted.)
That correlation is also recognized in the authorities collected by Judge Kanner's opinion in McNeely, supra, 125 So.2d at 315-16, where the court denied a claim for *192 an easement by prescription. As Powell points out, a clearer showing of adversity is necessary to extinguish an easement than to create one by prescription, because the servient owner's right of use is obviously greater, and to that extent presumptively less adverse, than that of one who claims in another's land an easement by prescription. Nevertheless, McNeely's "comparative analysis of physical aspects of a railroad right of way and the ordinary power line easement," when judging a claimed power line easement by prescription, is useful also to illustrate the comparative rights of the owner of an electrical transmission line easement and servient possessor, as in this case:
By the construction of its road bed, the installation of its ties and tracks, and through its railroading operations, a railroad adversely using land excludes the owner from and prevents his use of that land, and so exercises dominion over it and has possession. This is not to say that a railroad by arrangement or otherwise could not under any circumstances operate by virtue of an easement; but for the reasons stated, the usual adverse situation negates mere user. On the other hand, a power line principally utilizes a space-way and is not terrestially located as is a railroad right of way. Beneath the suspended power line many activities entirely consistent with use by the power company may be carried on. These activities may be of a productive nature; ordinary observation discloses a variety of instances wherein the lands beneath power lines are utilized for purposes of the owners of the lands involved. The nature of an easement depends upon its purpose, and the right to use the land beneath a power line for other purposes not conflicting nor interfering with the easement of the power corporation remains with the landowner. See Annotation, 6 A.L.R.2d 205. This is not to say that a power corporation could not own its right of way at all, but for the reasons stated, the ordinary adverse user in such circumstances does not establish possession. [125 So.2d at 317.]
As Judge Kanner said, "[t]he nature of an easement depends on its purpose," and its purpose is evidenced by the terms of the instrument of grant, the existing use of the easement within those terms, and the other or further uses to which the easement may be put. Whether Gulf Power's easement grant is perpetual we cannot say, for the 1926 instrument creating it was omitted from evidence; but the course of the easement was satisfactorily settled by evidence accepted by the circuit court, and the pertinent terms of the grant are agreed as follows:
The right to construct, operate and maintain electric transmission lines and all telegraph and telephone lines, towers, poles, and appliances necessary or convenient in connection therewith from time to time upon a strip of land one hundred feet in width, ... together with all rights and privileges necessary or convenient for the full enjoyment or use thereof for the purposes above described, including the rights of ingress and egress to and from said strip and the right to cut and keep clear all trees and undergrowth and other obstruction on said strip and danger trees adjacent thereto which now or may hereafter injure or endanger any of the works on said strip... .
Thus Gulf Power's right is "to cut and keep clear all trees and undergrowth," a right not exercised within 20 feet of the Kitzingers' greatest encroachment until two years after their house was built and occupied, and to "keep clear ... any other obstruction on said strip ... which now or may hereafter injure or endanger any of the works on said strip."
While it would not do to construe the terms of Gulf Power's grant so narrowly as to legitimize "obstructions" to "any of the works on said strip" that came into being before the "works" did, the very terms of the grant convey that sense of timing that we wish to emphasize in preserving both Gulf Power's right reasonably to use its easement in future years and the Kitzingers' right until then to enjoy their underlying fee in a way not in fact interfering with Gulf Power's use of the easement. Thus *193 the conveying instrument gives Gulf Power no right to keep clear "obstructions" that do not obstruct, nor to prevent uses of the servient estate that endanger only theoretical "works on said strip." The grant's reference to "obstructions" that "may hereafter injure or endanger" the works is no less a reference to interference in fact because it is a reference to interference "hereafter."
We must recognize, with Powell and other authorities, that "the erection of permanent structures, such as buildings or walls," is commonly regarded as "seriously interfering with the right of use." Powell, op. cit. supra. Aside from the possibility, not present here, of construing the power company's long toleration of permanent residences at several places within an easement as effectively defining the extent to which servient owners may use it anywhere, United States v. Cross, 339 F. Supp. 221 (D.Colo. 1972), aff'd, 477 F.2d 317 (10th Cir.1973) (applying Colorado law), houses and other permanent buildings encroaching power line easements have been enjoined from their foundations with some frequency. E.g., City of Seattle v. Nazarenus, 60 Wash.2d 657, 374 P.2d 1014 (1962); Missouri Power & Light Company v. Barnett, 354 S.W.2d 873 (Mo. 1962); Georgia Power Company v. Sullivan, 217 Ga. 699, 124 S.E.2d 634 (1962) (automobile service station, gas pumps, ground tanks and housetrailers); Snider v. Alabama Power Company, 346 So.2d 946 (Ala. 1977) (commercial building); Carolina Power & Light Company v. Bowman, 229 N.C. 682, 51 S.E.2d 191, 6 A.L.R.2d 194 (1949) (new trial ordered because, contrary to verdict, theatre interfered with overhanging wires). See also Annot., 6 A.L.R.2d 205 (1949), cited in McNeely, 125 So.2d at 317. Yet in each of those cases the continuing encroachment was, when enjoined, a clear and present interference with transmission lines previously in place within the easement.
Thus the ground storage of gasoline beneath the lines was held an obvious fire hazard and therefore "an actual interference with the operation and maintenance of the electric transmission line," Georgia Power, 217 Ga. at 703, 124 S.E.2d at 637. In some cases the structure blocked access to and maintenance of lines and poles. Possible house fires were also cited as inconsistent with the need for continued transmission power through overhanging lines; indeed, the possibility of house fires was shown to threaten the lives of firemen whose streams of water might, touching the lines, become fatal conductors themselves. E.g., Missouri Power; City of Seattle, supra.
In contrast to the cited cases, the Kitzingers' house interferes in fact with no beneficial use of the easement now or for fifty years past. The lateral safety zone encroached by their house is imagined as adjacent to power lines that do not now and may never exist. So, if the Kitzingers' use were a transient not a "permanent" thing, or a use easily and quickly withdrawn in a change of circumstances, an injunction would likely not be granted without proof of present interference with an existing use of the easement. For example, we may doubt that this court would have mandatorily enjoined the removal of the wrecked automobiles in Gulf Power Company v. Glass, 355 So.2d 147 (Fla. 1st DCA 1978), had they not constituted a present interference with access for emergency repairs to the lines. The statement in McCorquodale v. Keyton, 63 So.2d 906, 910 (Fla. 1953), "If a person's rights are invaded  as they were here  the degree of such invasion is unimportant," is not in our opinion to the contrary. The Supreme Court there enjoined the maintenance of a 12 by 16 foot snack shack in an easement for park purposes, not because the little building interfered with only a bare legal right, but because it interfered in fact with the present use of "all of the park" for park purposes.
As this analysis implies, "[w]here the dominant owner abstains from use of the easement, the servient owner ... has an enlarged scope of privileged action." Powell, op. cit. at ¶ 424. Or, as the Restatement says, "the privilege of use of the possessor of the servient tenement may vary as the respective needs of himself and *194 the owner of the easement vary." Restatement of Property § 486 comment a (1944). Though by fencing Whiteacre and keeping the gates closed A may ordinarily be held to have interfered unreasonably with B's right of way, by grant, through to Blackacre, the case is different if B "has no occasion to use the way except at long intervals of time." In that case, "holding that A may maintain swinging gates at the termini of the way is proper." Id., illustrations 1, 2.
To say that in the present circumstances the house should not be enjoined merely to preserve Gulf Power's further construction options that have gone unexercised for fifty years, and may never be exercised, is not to imply that Gulf Power's construction options are to be regarded as entitled to diminished protection from this point forward. What is implied, rather, is that the kind and degree of protection to be afforded Gulf Power is to be determined at "any given moment of time" at which Gulf Power requests and needs a remedy, under the circumstances then existing. Thus, Restatement of Property § 510 (1944):[3]
Under the general principle that each must accommodate his needs to those of the other to the extent to which it is reasonable to require him to do so, as the needs of the possessor of the servient tenement increase and the needs of the owner of the easement decrease, the privilege of use under the easement contracts. In the converse case, the privilege of use expands. As the privilege contracts or expands the protection given it varies, since the protection is limited by the extent of the privilege as it exists at the time of the alleged interference. To the extent to which the owner of an easement could use the servient tenement at any given moment of time he is entitled to protection with respect to his privilege of use.
The unliquidated lien imposed on the Kitzingers' property in lieu of an injunction is problematic for at least two reasons. First, because the Kitzingers' house and land constitute their homestead, the judgment runs afoul of article X, section 4(a), Florida Constitution (1968):
[The homestead] shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty... .
An equitable lien may not be imposed on homestead real property absent fraud or *195 reprehensible conduct, of which there is none here. Bessemer v. Gersten, 381 So.2d 1344, 1347 n. 1 (Fla. 1980); Clutter Construction Corporation v. Clutter, 173 So.2d 761 (Fla. 3d DCA 1965); Grass v. Great American Bank of North Miami Beach, 414 So.2d 561 (Fla. 3d DCA 1982). Tullis v. Tullis, 360 So.2d 375 (Fla. 1978), which recognized the necessity for partitioning homestead property held in common by the owners to whom it had devolved, is not to the contrary.
Moreover, since the lien is unnecessary to prevent the Kitzingers' (or their successors') acquisition of prescriptive rights, given the same circumstances, the lien is inequitable both because it is unnecessary and because it represents a premature judgment that, come the year 1990, or 2020, or whenever Gulf Power deems it expedient to construct lines and poles in the vacant half of its easement, requiring safety clearance from the house, Gulf Power's right will then be superior to the then householder's right of continued possession. Assuming the house then stands where it does now, and absent technological advances or other intervening circumstances that we shall not speculate upon, that prejudgment may well be correct; but the circumstances then requiring that judgment must be those then existing, not those that we now predict. For now it is enough to say that the Kitzingers' continued nonadverse possession, as in the present circumstances, will not alone prevent an injunction or other appropriate remedy for Gulf Power. Our present declaration of the correlative rights of the parties will not prevent that judgment, but presumably will aid it.
Except for excising the lien and the court's prejudgment of possible future controversies, it will be observed that we have arrived at essentially the same conclusion as did the able circuit judge, who rightly said that enjoining the house off the easement now would be inequitable. Whereas the circuit judge sought to preserve the easement by a lien, we preserve it by a judgment. In either case Gulf Power's easement is intact and in a continuation of the present circumstances will remain so. In deference to the authorities that seem to require a present remedy for any "permanent" construction by the servient owner upon another's easement, e.g. note 3 supra, we direct that damages of one dollar be awarded Gulf Power upon remand. For the present that entirely suffices to underscore our conclusion that the Kitzingers have acquired no right to maintain their house permanently where it is. Though their property is thus free of the lien, it is not free of Gulf Power's easement.
REVERSED and REMANDED.
SHIVERS and WIGGINTON, JJ., concur.
NOTES
[1] The Kitzingers' distinction between an action for trespass and one "on the case" is correct, but for purposes of the statute of limitations the difference is inconsequential. In both cases the four-year statute applies. Compare § 95.11(3)(g), applicable to "[a]n action for trespass on real property," which an easement is not, with § 95.11(3)(p), applicable to "[a]ny action not specifically provided for in these statutes." Sec. 95.11(6) provides, "Laches shall bar any action unless it is commenced within the time provided for legal actions concerning the same subject matter... ."
[2] Gulf Power argues that adverse possession by the Kitzingers cannot extinguish its easement until that possession has run 20 years. That argument, based upon McNeely, is the reciprocal of McNeely's holding that, absent a shorter statutory period, an easement cannot be established by prescription in less than 20 years. But the underlying fee owner's claim that his possession has extinguished an easement, or extinguished it to the extent of his possession, is a claim under color of title of adverse possession "exclusive of any other right," and such a claim, by statute, ripens in seven years. Sec. 95.16, Fla. Stat. (1981); see also Mumaw v. Roberson, supra, 60 So.2d at 743-44.
[3] Sec. 510 of the Restatement is within a chapter denominated "protection against third persons," though we discern no reason why it does not also address the rights of the dominant tenant against the servient owner. Comment c supports the conclusion that the Kitzingers' house is now an actionable interference, requiring at least nominal damages:

While any unprivileged interference with an actual use or one desired to be made under an easement is actionable, not every interference with the mere privilege of use is actionable. An interference with the privilege of use as contrasted with interference with an actual use must be of such a character as to have the potentiality of an interference with some possible future actual use. This potentiality may consist in interferences of such a permanent character that they may reasonably be expected to continue until they will interfere with an actual use desired to be made, or it may consist in interferences of such a character that, if permitted to continue unchallenged, they may have the effect of obscuring the title to the easement. Upon proof of such an interference, the owner of an easement is entitled to recover nominal damages without proof of actual harm.
Thus, the servient owner will not be heard to argue, for purposes of reducing the easement, that the owner has no need of an easement to the width granted. That was, in effect, the argument of the snack shack owner in McCorquodale, which the Supreme Court rejected. See also the Restatement's illustration 3 under § 510, which confirms that A "has a cause of action against C" (and, we would add, against B, the owner of Whiteacre, were he the actor) for fencing A's roadway easement in such a way as to reduce it from 30 to 20 feet wide. That "[t]wenty feet is sufficient for A's needs" does not vitiate A's cause of action. Under this analysis, as the Restatement's reference to nominal damages indicates, whether "plaintiffs are entitled to a mandatory injunction ordering the removal" is another question, i.e., whether that "would be inequitable." Tauscher v. Andruss, 240 Or. 304, 401 P.2d 40, 42 (1965).