COUNTY OF WESTCHESTER, Plaintiff,

v.

TOWN OF GREENWICH, CONNECTI-
CUT, Commissioner of Transportation
of the State of Connecticut, Laurelton
Nursing Home, Inc., Greenwich King
Street Associates II, L.P., the Convent
of the Sacred Heart, and Mildred To-
monto, Defendants.

No. 90 Civ. 1302 (GLG).

United States District Court,
S.D. New York.

June 2, 1992.

Marilyn J. Slaatten, Westchester County Atty., (Michael D. Diederich, Kimberlea R. Scholz, Asst. County Attys., of counsel), White Plains, N.Y., for plaintiff.

John E. Meerbergen, Town Atty., Law Dept., (Joyce H. Young, Asst. Town Atty., of counsel), Greenwich, Conn., Sive, Paget & Reisel (David Sive, of counsel), New York City, for defendant Town of Greenwich.

Stuart A. McKeever, Westport, Conn., for defendant Laurelton Nursing Home, Inc.

Cummings & Lockwood (Chase Rogers, of counsel), Stamford, Conn., for defendant Greenwich King Street Associates.

Kelley, Drye & Warren (Arnold S. Klein, of counsel), Berle, Kass & Case (Carl Koplan, of counsel), New York City, for defendant Convent of the Sacred Heart.

O'Rourke & O'Hanlon (Edward V. O'Hanlon, of counsel), New Canaan, Conn., for defendant Mildred Tomonto.

## OPINION

GOETTEL, District Judge.

I think that I shall never see a lawsuit as lovely as a tree. One may well wonder whether this would have been the opening of Joyce Kilmer's poem had his experience with trees included an intimate association with this case. While trees may indeed make lovely poems, they lose some of their aesthetic appeal when made the subject of litigation.

We return to the continuing saga of the County of Westchester's efforts to clear the airspace over property owned by several landowners on the Connecticut side of the border separating New York from Connecticut. Reduced to its simplest terms, this case represents the proverbial struggle matching commerce against nature, airplanes against trees.

## I. FACTUAL BACKGROUND

While the background of this case has been outlined in previous opinions, *see* 745 F.Supp. 951 (S.D.N.Y.1990) and 756 F.Supp. 154 (S.D.N.Y.1991), we shall detail the material facts so that our decision may be understood by those unfamiliar with the ongoing trials and tribulations of the Westchester County Airport.

Plaintiff, the County of Westchester, located in the State of New York, owns and operates the Westchester County Airport ("WCA") which abuts the border between New York and Connecticut. Defendants are all residents of Connecticut who own parcels of land on the Connecticut side of the border situated on or near the state line. The airport began operations more than forty years ago and is presently used by both private and commercial aircraft. It has developed into a busy regional airport servicing the air transportation needs of both New York and Connecticut residents.

The WCA currently utilizes two runways. Runway 16/34, the airport's primary runway, runs in a roughly northeast-southwestern direction for 6550 feet. Runway 11/29, the alternative runway embroiled in this dispute, is a 4450 foot long landing strip without an instrument landing approach, angled in a roughly east-west direction. Runway 11/29 is sandwiched between Interstate Highway 684 and Rye Lake on its western end and the Connecticut border on its eastern end. It is usually used only when the prevailing crosswinds make use of the main runway too dangerous for all but the largest classes of aircraft or during an emergency. Since the opening of the airport, runway 11/29 has been used frequently, ranging from as few as a dozen flights up to sometimes 80 flights per day.

The controversies in this case are, quite literally, rooted in the southeastern end of runway 11/29 fronting the New York–Connecticut border. Like all airstrips, runway 11/29 has an approach zone of airspace stretching out from its ends. On its southeastern end, runway 11/29, rather unfortunately, has an air approach located almost entirely in Connecticut. Accompanying the actual flight path used by airplanes while taking off and landing, the Federal Aviation Administration ("FAA") requires that buffers of airspace, known as "clear zones," exist above certain imaginary surfaces.

The FAA has determined that safe operation of airplanes requires that areas above these surfaces be kept clear of obstructions. *See Flowers Mill Associates v. United States*, 23 Cl.Ct. 182 (1991). FAA regulations specifically define two types of clear zones that are significant for this case: a trapezoidal-shaped "approach surface" beginning from a point 200 feet beyond the end of the runway and extending outward for a distance of 5,200 feet at a slope of one foot vertical rise for each 20 feet in horizontal distance (20:1), *see* 14 C.F.R. § 77.25(d), and a supplemental "transitional surface" rising from each side of the approach zone at a slope of one foot of vertical rise for every 7 feet of horizontal rise (7:1). *See* 14 C.F.R. § 77.25(e).[1]

The land underneath this airspace is owned by the various defendants, the Town of Greenwich, the Laurelton Nursing Home, Inc., the Convent of the Sacred Heart, Greenwich King Street Associates II, L.P., and Mildred Tomonto. Defen-

---

**1.** The FAA regulations use the term "clear zones" to refer collectively to the various imaginary surfaces they define. *See, e.g.,* 14 C.F.R. § 152.107(e)(1). Unless the discussion is specifically focused on one of these FAA-defined surfaces, the court shall use the term "clear zones" to refer generally to the airspace needed by airplanes as a safety buffer between the plane and objects on the earth's surface, airspace which would include both the FAA's approach (20:1) and transitional (7:1) zones.

dants' lands are filled with trees that over the years have, not surprisingly, been growing. Over time, an increasing number of trees located on the defendants' properties have grown into runway 11/29's clear zones eventually forcing aircraft using this runway to dramatically alter their landing patterns.

Documentation of this growth has been uneven. Testimony from pilots and a 1948 color photograph of the area show the existence of vacant fields with identifiable lines of trees along property boundaries and King Street, as well as clusters of trees on the Convent's property. The National Oceanographic and Atmospheric Administration ("NOAA"), a federal agency, has periodically surveyed runway 11/29's obstructions between 1949 and 1990 and produced official charts of the clear zones.

The 1950 NOAA chart shows two, possibly three, trees penetrating runway 11/29's 20:1 clear zone. In 1964, the NOAA chart shows 5 trees encroaching on the approach surface and 3 trees in the transitional surface. In 1970, NOAA individually identified 5 trees above the approach surface and 3 trees breaking the transitional surface.[2] The 1970 chart also documented wooded areas within the clear zones along the entire length of King Street, falling within the 20:1 clear zone as well as three larger wooded areas inside the 7:1 transitional zone. By 1982, NOAA separately identified 4 trees inside the 20:1 approach zone and 5 trees within the 7:1 transitional zone. Again, the 1982 chart noted wooded areas along nearly the entire length of King Street and also penetrating the left edge of the 20:1 approach zone. Also, significantly larger clusters of trees existed in the transitional clear zone bordering the left side of the 20:1 approach zone.

In 1984, the WCA contracted with a surveyor to determine the precise heights of obstructions to runway 11/29's clear zones using photogrammetric analysis. The results of the 1984 Donnelly survey show some 125 trees penetrating runway 11/29's clear zones. In 1990, Donnelly was again commissioned to survey the clear zones and documented some 128 trees inside the clear zones of which 55 were penetrating the 20:1 clear zone. There were also an additional 6 trees whose tops were broken but which had penetrated the clear zones in 1984.

In sum, the number of trees encroaching on runway 11/29's clear zones has increased significantly over the past forty-two years.[3] The changes in the land use have varied to some degree by defendant. Greenwich King Street Associates, a limited partnership, owns some 152 acres of property which has witnessed the most dramatic growth. What was primarily fields lined with a row of trees in 1948, before it purchased the property, has been transformed into a maturing forest.

Photographic evidence seems to indicate that a portion of King Street Associate's land had been used as a tree nursery for an uncertain period of time beginning in the 1960s, before King Street Associates acquired it. The nursery was subsequently abandoned and apparently many of the trees were left to grow wild. King Street Associate's property lies directly adjacent to the airport and underneath runway 11/29's center line. In 1989, the County proposed to remove or top infringing trees at its own expense while covering the cost of any landscaping necessary, but nothing ever came of the offer.

Defendant Laurelton Nursing Home's property contains fewer trees intruding on

---

**2.** Oddly enough, it appears that the 5 trees individually identified inside the primary zone in 1964 and 1970 are not the same 5 trees. Assuming the NOAA's numbering of the trees remained consistent in these years, 3 of the 5 trees penetrating the primary zone in 1964 were replaced by 3 different trees in 1970. There exists photographic evidence of trees being cut down which may explain this discrepancy. For the moment, however, this issue is of little consequence.

**3.** In both the NOAA and Donnelly charts, it appears that in certain areas within the defendants' properties it was not feasible to individually identify every tree due to the denseness of the forest. The true extent of the trees occupation of the clear zones cannot be determined. It is entirely possible, indeed likely, that the actual number of trees obstructing runway 11/29's clear zones is higher than currently identified.

runway 11/29's clear zones, primarily concentrated near the intersection of the primary and transitional zones near the northern border of the property. Plaintiff notes that defendant Laurelton Nursing Home was required to get approval, which it did, from the FAA as a condition precedent to its construction of the nursing home.

Defendant Mildred Tomonto's property also contains fewer intrusive trees by comparison than exist on Greenwich King Street Associates' land. Tomonto's trees are located immediately adjacent to the airport, on the north side of the land near the Tomonto house, and along its boundary with the Laurelton Nursing Home. While fewer in number, the Tomonto trees are disproportionately problematic because they are growing near runway 11/29's center line. In 1989, the WCA requested permission of Tomonto to enter her property to cut down certain trees inside the clear zones. The WCA maintains that it received no response from Ms. Tomonto, interpreting this as a rejection of its offer.

The Town of Greenwich, in its management of King Street as a public thoroughfare, has assumed responsibility for maintenance of the trees lining King Street. King Street traverses the entire width of the 20:1 clear zone crossing runway 11/29's center line some 1200 feet from the end of the runway. Its trees have grown substantially over the years.

In 1963, the Town's Planning and Zoning Commission adopted a Land Use Plan of Development that included the Commission's proposal to control the use of land within the WCA's clear zones to "prevent the erection of structures within them." The Plan was a statement of land use objectives that carried with it no direct effect on land use within Greenwich. Its implementation depended upon actions by other Town agencies and the willingness of property owners in developing their lands in conformance with the plan.

The WCA's clear zones, however, have been factored into the zoning and construction permitting process of the Town of Greenwich. In December 1963, the Town's Planning and Zoning Commission recom-

mended the denial of defendant Laurelton Nursing Home's application to build a nursing home adjacent to King Street specifically because of its safety concerns over locating the proposed building within one of the WCA's runway clear zones.

In 1975, the Town's Planning and Zoning Board of Appeals denied an appeal for a zoning variance that would have permitted the start of a tree surgery business and the parking of road equipment on the western side of King Street. The Board found that the applicants were not uniquely burdened by the WCA since the airport was a common burden on all that area's property owners.

On April 27, 1987, the Board denied an appeal by Greenwich King Street Associates I, L.P. to erect an office building on the east side of King Street. Again, the Board concluded that the hardship on the applicant caused by the neighboring airport was a common burden on all property owners in the area and did not justify a unique hardship variance to the zoning regulations.

Compared to the other defendants, the property belonging to defendant Convent of the Sacred Heart is set furthest from runway 11/29. The bulk of the Convent's trees penetrating the clear zones are located near the Convent's main building. Many of these trees existed when the WCA first opened, although many others are newer. A number of them stand under runway 11/29's center line, and like those lining King Street, can partially block a pilot's view of the runway during a final approach. The Convent's trees have seen substantial growth. The Convent admits that it has maintained and nurtured its trees over the years and desired its trees along King Street to provide screening from the airport.

Information concerning tree intrusions into runway 11/29's clear zones was first brought to the WCA's attention as early as 1969. In March 1981, after conducting on site inspections of the airport, the FAA informed the WCA by letter that tree obstructions were observed in the clear zones and approaches to runway 11/29. The

FAA requested the WCA to initiate action to remove the obstructive trees. Three months later, the FAA reiterated its position regarding the removal of trees within runway 11/29's clear zones and recommended displacement of the runway landing threshold if removal was not possible.

The FAA's attention to runway 11/29 resurfaced in September 1984 when it requested that the WCA document all penetrations of its clear zones and provide a scheduled plan of action for the removal of any obstructions, or displace the runway threshold. The FAA set a December 1984 deadline for receipt of the information.

The WCA responded in October 1984 advising the FAA that it had issued a "notice to airmen" or "NOTAM" advising pilots to use steeper descents when approaching runway 11/29 in order to clear the trees blocking the clear zones. The WCA also informed the FAA that an aerial survey had been conducted and was being charted. The preliminary results were that some 79 trees in Connecticut currently encroached upon the clear zones. The WCA concluded that it was researching its legal options and would incorporate the NOAA's obstruction chart findings into its study.

Again in early February 1985, the FAA contacted the WCA asking for an evaluation of the latest obstruction chart produced by the NOAA, a plan of action, and a timetable for disposing of each obstruction. The FAA reset the deadline to February 28, 1985. Apparently venting frustration with the WCA's lack of progress, the FAA sent a terse letter in May 1985 stating that prompt action in the form of tree removal or runway displacement was necessary since the tree penetrations into runway 11/29's clear zones were substantial and hazardous.

The dialogue between the FAA and the WCA continued through 1989. Another FAA warning was communicated to the WCA in October 1988 stating that immediate action was required to remove the multiple intrusions into runway 11/29's clear zones that threatened the safety of landing aircraft. The FAA warned that if the trees were not removed or topped by the end of October 1988, it would order the displacement the runway's landing threshold.

True to its promise, in February 1989, the FAA ordered runway 11/29's landing threshold to be displaced, effectively shortening the usable runway by some 1300 feet. Some time later, the Connecticut property owners rejected an offer by the County to trim the trees back to an acceptable height at the County's expense. The County projects that by the year 2000, the runway will require a displacement of some 1700 feet, a loss severe enough to possibly shut down runway 11/29.

In February 1990, the County of Westchester instituted an action for declaratory and injunctive relief against the Town of Greenwich, the Commissioner of Transportation for the State of Connecticut, Laurelton Nursing Some, Greenwich King Street Associates II, the Convent of the Sacred Heart, and Mildred Tomonto. In an earlier decision, this court dismissed plaintiff's state law cause of action against the Commissioner of Transportation of the State of Connecticut holding that the Eleventh Amendment to the United States Constitution prohibited such suits. The court also dismissed plaintiff's claims against the remaining defendants under the interstate commerce clause of the Constitution, the Federal Aviation Act, and public nuisance under Connecticut's statutory law.

The County has three remaining causes of action before this court: prescriptive easement, common law nuisance, and equitable servitude. First, the County contends that under Connecticut law it has acquired a prescriptive easement over the airspace used to navigate landings and takeoffs from runway 11/29 through its use over the past forty or more years. According to the County, this corridor of airspace approaching runway 11/29 has existed and been used without any material obstructions from 1945 up through the early 1970s. This airspace, argues plaintiff, is located directly above the imaginary surfaces specified by the FAA and provides a safety buffer of air between the flight path and the nearest object on the surface. Plaintiff argues that by flying through its

approach paths it has used this corridor of airspace—what it terms clear zones—as a safety buffer for purposes of acquiring a prescriptive easement.

Defendants offer several arguments in response. At base, they argue that the County can point to no fifteen-year period during which planes used the approach to runway 11/29 with its clear zones devoid of trees. Indeed, defendants contend that trees have penetrated the clear zones since 1949 and in significant numbers at least since 1970 when they extended across the primary zone.

Defendants further argue that the County's conduct belies any notion that it was acting under a claim of right. The County repeatedly attempted to secure permission from the landowners to trim the troublesome trees and generally failed to act in a manner which put defendants on notice of their use of the clear zones as a claim of right. Citing Connecticut laws on easements, they also stress that prescriptive easements may only extend to those portions of another's property that have been actually or physically used. In their view, the County can acquire a prescriptive easement under Connecticut law only over the airspace in which its planes actually flew, provided it meets the other easement requirements, something defendants strongly contest. Since no planes continuously flew through the clear zones (as contrasted to flight paths) for a fifteen year period, no prescriptive easement to this airspace ever matured.

Even assuming that the County secured a prescriptive easement over the clear zones, defendants claim to have regained their rights to this airspace by reoccupying the clear zones with their trees for more than fifteen years, in essence supplanting any easement the County may have secured with a subsequent prescriptive easement of their own.

Defendants also claim that the use of the clear zones airspace for trees is both reasonable and lawful as a matter of law, precluding any finding of a nuisance. In their view, locating a runway adjacent to a wooded, suburban, residential property was

the unreasonable action, not the growing of trees. Granting the County its easement, says defendants, will force the clearing of trees down to such low airspaces as to unreasonably restrict the defendants' use of their properties. Moreover, they argue, given the County's actual knowledge of the tree obstructions since 1969, its persistent inaction prevents it from seeking its equitable relief now under the doctrine of laches.

## II. DISCUSSION

Plaintiff and all of the remaining defendants have moved for summary judgment on the claims of prescriptive easement, public nuisance, and equitable servitude, each arguing that no material facts exist to preclude this court from ruling on the issues as a matter of law.

The standards for summary judgment are firmly rooted in our legal landscape. To prevail, the moving party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those facts that "might affect the outcome of the suit under the governing law ... [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All parties in this case contend that the evidence presented leaves no materials facts in dispute.

The court must resolve all ambiguities and draw all inferences in favor of the party defending against the motion. *Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Uncertainty regarding the true state of any material fact will defeat a summary judgment motion. *United States v. One Tintoretto Painting Entitled "The Holy Family With St. Catherine and Honored Donor"*, 691 F.2d 603, 606 (2d Cir.1982).

The County of Westchester claims that it is entitled to the unobstructed use of runway 11/29 including the clear zones which accompany its use.[4] In response, defendants contend that the County has not established any easements, and even if so, defendants have regained by prescription an easement giving their trees the right to continued upward mobility. This court previously held that the County's causes of action are rooted in Connecticut law. *County of Westchester v. Town of Greenwich*, 745 F.Supp. 951, 957 n. 7 (S.D.N.Y. 1990). It is under this canopy of law that we shall attempt to resolve these issues.

A. *The Common Sun, The Air, The Skies*[5]*: Federal Law on Airspace*

Although this court previously held that federal regulation of the nation's airspace provides no foundation for a cause of action by the County, we shall outline the federal law on airspace which stands as a backdrop for our decision.

 The navigable airspace of the United States has been incorporated into the public domain. *See City of Oakland v. Nutter*, 13 Cal.App.3d 752, 92 Cal.Rptr. 347 (1st Dist.1970) (citing cases); *Shipp v. Louisville & Jefferson County Air Bd.*, 431 S.W.2d 867, 870 (Ky.1968), *cert. denied*, 393 U.S. 1088, 89 S.Ct. 880, 21 L.Ed.2d 782 (1969). Congress, expressing its sovereignty over the nation's navigable airspace, has recognized "a public right of freedom of transit through the navigable airspace of the United States." 49 U.S.C.App. § 1304. "Navigable airspace" is defined as:

airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include air-

space needed to insure safety in take-off and landing of aircraft.

49 U.S.C. § 1301(24). This navigable airspace extends down to an imaginary surface 50 feet above the surface of defendants' lands. *See* 14 C.F.R. § 151.9(b).

Effectively, federal law has pruned the bundle of property rights held by surface landowners rather than uprooted it in its entirety. They retain the right to the use and enjoyment of their land including the immediate airspace that can be reasonably used. "We own so much of the space above the ground as we can occupy or make use of, in connection with the enjoyment of our land. This right is not fixed. It varies with our varying needs." *Allegheny Airlines, Inc. v. Village of Cedarhurst*, 132 F.Supp. 871, 879 (E.D.N.Y.1955), *aff'd*, 238 F.2d 812 (2d Cir.1956) (quoting *Hinman v. Pacific Air Transport*, 84 F.2d 755, 758 (9th Cir.1936)); *see also Jackson Municipal Airport Authority v. Evans*, 191 So.2d 126 (Miss.1966); *Mills v. Orcas Power & Light Co.*, 56 Wash.2d 807, 355 P.2d 781 (1960).

 Low altitude flights which unreasonably interfere with the use and enjoyment of the land represent a trespass or partial taking creating a right to compensation. *See United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). As the Court stated in *Causby:*

The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate

---

**4.** We note an additional motivation behind the County's present litigation. The County has planned to expand the airport by adding an additional runway and a new terminal. To be eligible for federal grants for airport development projects under the federal-aid Airport Program, the County must "own, acquire, or agree to acquire control over, or a property interest in, runway clear zones that the Administrator considers adequate." 14 C.F.R. § 152.107(e)(1) (1991); *see also* 14 C.F.R. § 151.11. An airport possesses a sufficient property interest "if it has an easement ... giving it enough control to rid

the clear zone of all obstructions (objects so far as they project above the approach surfaces established by § 77.27(b) and (c) of Part 77 of this chapter), and to prevent the creation of future obstructions; together with the right of entrance and exit for those purposes, to ensure the safe and unrestricted passage of aircraft in and over the area." 14 C.F.R. § 151.9.

**5.** Thomas Gray, *Ode on the Pleasure Arising from Vicissitude*, 1. 49.

interference with the enjoyment and use of the land.

*Id.* at 266, 66 S.Ct. at 1068. Even when such flights fall within the navigable airspace, and therefore use of this low altitude airspace is authorized, compensation is still required for the taking. *See Griggs v. County of Allegheny,* 369 U.S. 84, 88–89, 82 S.Ct. 531, 533, 7 L.Ed.2d 585 (1962).

This case is unique, largely because the airport seeking easements is located in a different state from the adjacent landowners whose airspace is at issue. We previously held that FAA regulations furnish no basis for the County to compel the removal of the trees. *County of Westchester,* 745 F.Supp. at 955–57. The County, powerless to exercise eminent domain over property across the state line, was forced to resort to remedies provided under Connecticut law. Thus, we must turn to the question of what rights and remedies exist for the parties under Connecticut law concerning the airspace immediately above defendants' properties.

B. *Flying Chariots Through Fields Of Air* [6]*: Prescriptive Easements*

■ Connecticut law on prescriptive easements is clear. Be it flying machines or growing trees, to show the existence of an easement by prescription a person must show use that is open, visible, continuous, uninterrupted, and adverse, made under a claim of right for a period of fifteen years. *Klar Crest Realty, Inc. v. Rajon Realty Corp.,* 190 Conn. 163, 459 A.2d 1021 (1983); *McCullough v. Waterfront Park Ass'n, Inc.,* 1992 WL 24332, 1992 Conn.Super. LEXIS 240 (Conn.Sup.Ct.1992); *see also* Conn.Gen.Stat.Ann. § 47–37 (West 1988) (requiring fifteen years of continuous, uninterrupted use for easements).

■ The term "under claim of right" means "without recognition of the rights of the owner of the servient estate." *Andrejczyk v. Advo System, Inc.,* 146 Conn. 428, 151 A.2d 881, 883 (1959). A prescrip-

tive easement is valid only if its boundaries can be determined with reasonable certainty. *See Reynolds v. Soffer,* 190 Conn. 184, 459 A.2d 1027 (1983); *Keiko v. Dolinger,* 184 Conn. 509, 440 A.2d 198 (1981).

The County maintains that it has acquired such an easement over a corridor of airspace through which planes using runway 11/29 navigate, airspace that includes the so-called clear zones. At the outset, we must be clear as to the nature of the easements being contested. The County has the tendency to speak of its rights as encompassed within a single easement. Defendants correspondingly maintain that the existence of trees inside the clear zones since the airport's opening undercuts the County's easement claim entirely in one fell swoop.

Although the core of the County's claim seems to be its right to remove defendants' trees from the clear zones, its claim represents a combination of rights of usage encompassing two separate easements. The County asserts an avigation or flight easement giving it a right to fly through the airspace above defendants' properties. Concurrently, it seeks a clearance easement providing it the right to cut down those trees obstructing the approach to runway 11/29 and its clear zones.

■ These two easements are distinct. *See United States v. Brondum,* 272 F.2d 642, 644–45 (5th Cir.1959) (distinguishing avigation from clearance easements); *United States v. 64.88 Acres of Land,* 244 F.2d 534, 535–36 (3rd Cir.1957); *see also City of Oakland v. Nutter,* 13 Cal.App.3d at 763, 92 Cal.Rptr. 347. The purpose of avigation easements is to allow aircraft to fly through a given airspace. The function of the clearance easement, likened to a ceiling, is:

to increase the margin of safety for flying by assuring that the glide zone will be free from natural growth or manmade obstructions and the pilot's vision unobscured above a designated altitude.

---

6. Erasmus Darwin, *The Botanic Garden,* pt. I. The full stanza reads:

Soon shall thy arm, unconquered steam! afar
Drag the slow barge, or drive the rapid car;
Or on wide-waving wings expanded bear
The flying-chariot through the fields of air.

*City of Oakland v. Nutter,* 13 Cal.App.3d at 763, 92 Cal.Rptr. 347.

From the tenor of its arguments, it is apparent that the County seeks recognition of both types of easements. First, it seeks an avigation easement over the glide path for runway 11/29 that aircraft used before the trees forced significant changes in flight paths. Second, the County seeks a clearance easement allowing it to remove, or at least top, trees encroaching upon the airspace located within runway 11/29's clear zones, airspace located between the lower limits of the navigable airspace and the upper limits of usable airspace above defendants' lands.

## C. · Objects In An Airy Height[7]: Existence of Easements Under Connecticut Law

Before determining whether the County has met the requirements of establishing a prescriptive avigation or clearance easement for runway 11/29's clear zones, our initial inquiry is whether such easements are even cognizable under Connecticut law.

### 1. The Avigation Easement

 It appears that Connecticut courts have yet to reach the question of whether avigation easements may be acquired by prescription. Among the few jurisdictions that have addressed this issue, there is general disagreement over whether an avigation easement may be acquired by prescription.

While not deciding the existence of a prescriptive avigation easement on the facts before it, the California Court of Appeals has stated that it saw "no reason why an avigation easement may not be acquired by prescription in this state." *Drennen v. County of Ventura,* 38 Cal.App.3d 84, 87 n. 2, 112 Cal.Rptr. 907 (2nd Dist.1974). The court in *Petersen v. Port of Seattle,* 94 Wash.2d 479, 618 P.2d 67 (1980), while also concluding that no such easement had been evidenced, similarly recognized the exist-

ence of prescriptive avigation easements. *See id.* 618 P.2d at 70–71.

The Supreme Court of Appeals for West Virginia, however, reached a contrary conclusion. Emphasizing the practical difficulties in recognizing and defining prescriptive avigation easements, the court in *Sticklen v. Kittle,* 168 W.Va. 147, 287 S.E.2d 148 (1981), held that prescriptive easements of avigation did not exist. The court voiced its concern that changes in the types and frequency of overflying aircraft, multiple flight patterns, and overflights of several different tracts of land create intractable problems in defining the boundaries and uses of a particular avigation easement. *See id.* at 155, 287 S.E.2d 148.

While the status of an avigation easement under Connecticut is unfixed at present, we are persuaded that recognition of a prescriptive avigation easement is the proper course. As we stated in an earlier opinion, it stands to reason that if overflights are considered a definite enough act to form the basis of a constitutional takings claim, such activity should be considered tangible enough to form the basis of a prescriptive easement. *See County of Westchester v. Town of Greenwich,* 745 F.Supp. at 961. Whether a party's actions sufficiently establish an easement's boundaries with a reasonable degree a certainty would generally be a question of fact requiring resolution by the trier of fact.

### 2. The Clearance Easement

 Determining the status of clearance easements under Connecticut law is a more difficult task. It has been stated as a general proposition that negative easements, easements preventing someone from using a given property, cannot be established by prescription "because the claimant of such an easement does not become subject to legal action at the hands of the owner of the potential servient estate by engaging in the conduct appropriate to establish such an easement." *Classen v. State, Dept. of Highways,* 621 P.2d

---

7. Matthew Prior, *To the Honorable Charles Montague,* which reads in part:

Our hopes, like towering falcons, aim
At objects in an airy height; ·

15, 18 (Alaska 1980) (quoting 3 R. Powell, The Law of Real Property ¶ 413, at 34–119 (Rohen rev. ed. 1979)). Clearance easements would seem to fall in this category, essentially representing a right to prevent surface landowners from using certain airspace.

Underlying this general rule is the notion that an airport seeking a clearance easement cannot satisfy the requirements that its use be adverse, open, visible, and actual. Defendants contend that use of a clear zone, by definition an empty zone of airspace absent some emergency, cannot be an open and visible use which constitutes an action adverse to the owner's rights to the airspace giving it knowledge and opportunity to asserts its own property rights in opposition. *See Aksomitas v. The South End Realty Co.*, 136 Conn. 277, 70 A.2d 552, 554 (1949) ("[U]se must be so open, visible, and notorious as to give the owner knowledge and a full opportunity to assert his own rights."). Thus, the argument goes, no prescriptive clearance easements can develop as a matter of law.

We have been unable to find any Connecticut authority directly addressing whether clearance easements may be acquired by prescription. The possibility of establishing a clearance easement to airspace by prescription has been implicitly recognized in other jurisdictions. *See, e.g., Shipp*, 431 S.W.2d at 870.[8] Connecticut courts, however, have discussed other types of use, beneficial to the public, which do not seem to meet, on their face, the requirements of an actual physical use.

The court in *American Trading Real Estate Properties, Inc. v. Town of Trumbull*, 215 Conn. 68, 574 A.2d 796 (1990), addressed the notion of "actual public use"

when an adverse possession claim is made against a town. The Connecticut Supreme Court found that limiting the definition of public use to physical uses only was unduly narrow. *American Trading*, 574 A.2d at 801–02. The court discussed a town's use of a buffer of undeveloped property to protect a park from encroaching development. It also imagined the use of open space or undisturbed land to protect communities, wildlife, or wetlands. *Id.* Recognition of such nonphysical uses was deemed necessary to protect the existence of highly beneficial public interests like the environment.

Other courts have also viewed the concept of actual use as encompassing more than simply what is physically occupied. *See, e.g., Platt v. Ingham County Road Commission*, 40 Mich.App. 438, 440, 198 N.W.2d 893 (Ct.App.1972) ("Since a right-of-way is deemed to encompass such use of the land at or beneath the surface as will make the easement effective, a similar concept of use must be employed in determining 'actual use.'").

Protecting the ability of aircraft to use the WCA's runway 11/29 requires recognition of an analogous buffer of unused airspace. Safeguarding the passage of aircraft over populated areas is obviously of paramount concern to the County, and presumably to Connecticut as well. The Commissioner of Transportation for Connecticut has to date shown no interest protecting its citizens, who use the WCA in significant numbers, by removing the trees from runway 11/29's clear zones. The Commissioner is apparently empowered by statute to require owners of any obstacles constituting a hazard to aerial navigation to remove those obstacles.[9]

The little pleasure of the game
Is from afar to view the flight.

**8.** The court in *Shipp v. Louisville & Jefferson County Air Bd.*, 431 S.W.2d 867 (Ky.1968), refused to recognize the Air Board's acquisition of a prescriptive easement holding that the landowners' right to grow trees inside the contested zone of airspace had been established prior to the promulgation of the FAA regulations or the installation of the VASI system. In short, the property owners' rights to use the airspace matured before the rights of the Air Board, derived from Federal Aviation Act of 1958, germinated.

**9.** Section 15–74(a) of the Connecticut General Statutes states that:

The commissioner shall notify the owner or person responsible for the existence of *any* obstacle so located as to constitute a hazard to aerial navigation or to the efficient or safe use of *any* airport, requiring such owner or other person to remove such obstacle within such reasonable time as is fixed by said commissioner. The owner or owners of such airport shall pay to the owner of such obstacle just compensation for such removal.

While it is by no means clear, we conclude that Connecticut law would recognize the establishment of a clearance easement by prescription. Connecticut recognizes certain non-physical uses of land when they serve important, even vital, public needs. Moreover, in the case of airspace, federal regulations specifically define the existence of such zones of airspace. The public is on general notice that aircraft passing overhead maintain their safe passage by relying upon clear zones underneath their glide paths. Under these circumstances, to insure the safe use of these flight paths, we conclude that clearance easements to such airspace can be acquired by prescription.

D. *Saw The Heavens Fill With Commerce* [10]: *Establishment of an Avigation Easement*

Given their legal existence, the question remains whether the County's use of runway 11/29 meets the requirements for establishing a prescriptive easement over the airspace needed for its flight paths and clear zones. In assessing the County's claims, we shall treat the prescriptive easement requirements as falling within two broader categories. The first grouping of easement criteria define the physical nature of the use that places an owner on notice. These notice-oriented criteria include the requirements of adverse, open,

and visible use under a claim of right. The second set of criteria address the more temporal aspects of easements, that is the requirements of continuous, uninterrupted use for at least fifteen years.

1. Cannot See The Glide Path For The Trees?: The Notice Criteria For Easements

▇▇▇ We begin by addressing the County's prescriptive avigation easement claim. The County is seeking to reestablish its ability to use the glide path for runway 11/29 that aircraft had used until defendants' trees forced planes to substantially adjust their takeoff and landing patterns. We shall confine our analysis here to the airspace actually used by the County for its approach path to runway 11/29, namely the airspace that aircraft flew through.

We first examine the first branch of the easement criteria, the open, visible, and adverse requirements for a prescriptive easement. We have no trouble concluding that the County's use of the glide paths was open and visible. Aircraft regularly passing overhead during their landings and takeoffs are hard to miss. And defendants have offered no evidence that any Stealth fighters operated on runway 11/29 or that any of the aircraft used the infamous Rom-

---

Conn.Gen.Stat. § 15–74(a) (emphasis added). The provision includes nothing limiting its application to only those obstacles that are hazardous to airports located within Connecticut. Indeed, such a restriction would emasculate the clear purpose for this provision, to protect Connecticut citizens from and aerial accidents caused by obstructions located within the state.

Other sections, intended to be applied more narrowly, state such restrictions clearly. *See, e.g.,* 15 Conn.Gen.Stat. § 15–73 (limited to airports acquired or operated by the state); 15 Conn.Gen.Stat. § 15–76(a) (limited to any airport or landing field located in the state); 15 Conn.Gen.Stat. § 15–90 (applying only to publicly-owned airports in the state). The plain meaning of § 15–74 is that the overriding safety concerns associated with aerial hazards merited granting the Commissioner broad authority to order the removal of any obstacles to aerial navigation standing within Connecticut's borders.

The Connecticut Supreme Court seems to agree. It has stated that "Section 15–74 applies

to all airports, while § 15–73 applies only to state acquired or operated and municipal airports. Section 15–74 is not inconsistent with §§ 15–73, 13b–43 and 13b–44 to the extent it applies to nonstate, nonmunicipal airports." *Powers v. Ulichny,* 185 Conn. 145, 440 A.2d 885, 891 (1981).

10. Lord Alfred Tennyson, *Locksley Hall,* which reads in part:

> For I dipped into the future, far as human eye could see,
> Saw the Vision of the world, and all the wonder that would be;
> Saw the heavens fill with commerce, argosies of magic sails,
> Pilots of the purple twilight, dropping down with costly bales;
> Heard the heavens fill with shouting, and there rained a ghastly dew
> From the nations' airy navies grappling in the central blue.

ulan cloaking device.[11]

For the clearance easement sought by the County, defendants contend that the County cannot show that use of clear zones, which are essentially empty airspaces, can be open, visible, or adverse. While this position carries a certain common sensical force, we do not reach the same legal conclusion. Although clear zones are at base a buffer of unobstructed airspace between an airplane and the top of any surface obstructions, this does not mean by definition that the open and visible easement requirements cannot be met.

Defendants do not contend that they were unaware of the constant overflight of aircraft using runway 11/29 over the years. Anyone watching a plane pass overhead, besides seeing the basic flight path, would certainly see a buffer of airspace underneath the flight path separating the plane from the nearest obstacle. On occasion, particularly in foul weather, flights will drop below the prescribed glide path, making use of the safety buffer.

On the issue of whether use of the glide path for the avigation easement was adverse, we reach a similar conclusion. The defendants' properties lie beneath runway 11/29's approach path. In the case of Greenwich King Street Associates, their land directly abuts the airport. Any conceivable take off or landing path must pass through airspace over these lands at altitudes low enough to be considered adverse. As defendants concede, the FAA-defined approach path lies at its lowest point within 31 feet of the surface of Tomonto's property and 17 feet above Greenwich King Street Associates' land. *See* Defendant Tomonto's Memorandum of Law at 3; Greenwich King Street Associate's Memorandum of Law at 7.

Aircraft passing at such low altitudes above defendants' properties doubtless represent an adverse use. The County's use of the airspace for flight paths and safety buffers is incompatible with the defendants' desire to grow their trees in this airspace. Therefore, we conclude that the County's use of runway 11/29's flight path has been open, visible, and adverse.

The question of adversity for the clearance easement is a more difficult issue. As with the avigation easement, aircraft following a 3–degree glide path buffered by a clear zone lying above the FAA-defined 20:1 approach surface use airspace as close as 17 feet from the ground. At this range, there is no doubt that the County's use of the clear zones as safety buffers is incompatible with defendants' desire to grow trees of substantial height on their properties.

Defendants also contend generally that the County failed to act under a claim of right. They argue that the County's communications to defendants Tomonto and Greenwich King Street Associates requesting permission to enter their properties to trim obstructive trees shows an implicit recognition of defendants' rights to the contested airspace. We disagree. "Use under a claim of right means 'without recognition of the rights of the owner of the servient tenement.' " *Wadsworth Realty Co. v. Sundberg,* 165 Conn. 457, 464, 338 A.2d 470 (1973).

Requesting permission to enter defendants' properties in order to top trees does not belie plaintiff's claim to have used the airspace under a claim of right. Asking permission to enter onto defendants' grounds is different than seeking permission to enter the airspace. The former simply implies concern for avoiding a potential charge of trespassing; the latter act by the County would be tantamount to recognizing defendants' right to the airspace, something the County has not done.

2. When The Bark Became Worse Than The Flight: The Temporal Easement Criteria

We turn to the temporal easement requirements. Defendants' primary contention is that no fifteen-year period exists

---

**11.** For those unacquainted with the television series "Star Trek," this reference is to a device used by a civilization of beings called Romulans which rendered their spacecraft invisible to the naked eye.

during which time the clear zones were devoid of trees. This argument presumably runs against both types of easements sought by the County. Since planes were never able to fly unobstructed through the clear zones for any fifteen-year period, defendants conclude that the airport is unable as a matter of law to establish the requirement of continuous, uninterrupted use for an avigation easement. For the same reason, defendants contend that no clearance easement was acquired since trees have always occupied the 20:1 clear zone.

Defendants are correct that some trees have occupied the 20:1 clear zone since the airport's early days. The question is, however, whether plaintiff must show full command over the FAA-defined clear zones in their entirety to establish a prescriptive avigation to airspace above defendants' properties. We think not. The linchpin of the County's avigation easement claim is use of the glide path. If trees occupying the clear zones did not force aircraft to alter their approaches to runway 11/29, they have not defeated the County's uninterrupted use of its approach path.

Until the trees actually and substantially interfere with the County's enjoyment of its flight easement, defendants have done nothing actionable for which the County could seek to enforce its flight easement. *See Kelly v. Ivler*, 187 Conn. 31, 450 A.2d 817 (1982) (stating that an obstruction to an easement is abatable if it materially or substantially interferes with the reasonable enjoyment of the easement). In short, defendants' trees must obstruct the glide path enough to interrupt its use by the County.

If trees did substantially obstruct the County's use of the 3–degree glide path and clear zones after the County had 15 years of uninterrupted, continuous use, it must be determined whether any of the defendants reacquired use of this airspace through their own prescriptive easements.

Usually, these questions of obstruction would be issues of fact to be resolved by the trier of fact. Here, however, both sides, referring to the series of NOAA charts and Donnelly surveys, argue that the material facts concerning tree growth in runway 11/29's clear zones cannot be disputed, although each draws contrary conclusions from the evidence. Defendants highlight evidence that some trees existed within the 20:1 primary clear zone since 1949. The 1950 NOAA chart shows two, possibly three, trees penetrating the 20:1 clear zone along its outer edges on what appears to be the properties of King Street Associates and Tomonto.

On the 1964 NOAA chart, five trees are individually identified which appear to penetrate the 20:1 approach zone, three along its outer sides between approximately 400 and 1000 feet from the end of runway 11/29, and two nearer to the runway's centerline also standing approximately 500 and 1000 feet from the runway's threshold. *See* Defendants' Exhibits 1 and 2. The 1964 NOAA chart also shows wooded areas lying inside the 20:1 clear zone between 500 and 1500 feet from the runway.

By 1970, however, the NOAA chart showed a wooded area extending across the width of the 20:1 clear zone. Russell Deposition at 274. This would have prevented approaching aircraft from using the airspace along the 20:1 approach surface. However, the 20:1 approach surface acts as a floor for the airspace available to approaching aircraft. As trees climb into the 20:1 clear zone, the cushion of airspace aircraft use for safety decreases. It is undisputed that trees have always existed inside the clear zones to some degree. This fact alone, however, does not undercut the County's avigation easement claim. Nothing shows that trees interrupted an aircraft's use of the 3–degree glide path or that any airplanes automatically adjusted their glide paths to steeper angles.

When trees initially began to crowd the clear zones, some pilots chose to maintain their stabilized 3–degree glide path, flying nearer to the treetops instead of significantly altering their approach paths. *See, e.g.*, Hughes Affidavit at 4. Since the mere existence of trees within the clear zones does not defeat the County's easement claim, the crucial question becomes when did the trees begin to significantly impair

the County's ability to use runway 11/29. If the record indicates a dispute over this material question of fact, its resolution would have to await trial, and the summary judgment motions would be denied.

The record, however, does not demonstrate such a dispute. When the troublesome trees were fewer and more isolated, they posed no significant problems for landing aircraft. Doak Affidavit at 9; Hughes Affidavit at 5–6; Lewis Affidavit at 6. During the earliest stages of tree growth in the clear zones, pilots during approach would add some power to momentarily level off the aircraft as they passed over the trees then resumed their descent at somewhat more than the 3–degree path. Doak Affidavit at 7; Watts Affidavit at 6.

Pilots' have uniformly recounted that trees in the clear zones did not significantly obstruct the basic 3–degree approach which was practiced until the late 1970s or early 1980s, thirty or more years after the airport opened. .See, e.g., Clemow Affidavit at 4; Hughes Affidavit at 6; Lewis Affidavit at 4; Watts Affidavit at 6. At this point, pilots resorted to steeper approach paths to avoid the larger numbers of trees intruding into the 3–degree glide slope. See, e.g., Hughes Affidavit at 6; Lewis Affidavit at 5; Soliman Affidavit at 4; Watts Affidavit at 7. As one flight instructor put it when describing his teaching of approaches that sharply deviated from the normal 3–degree approach, "[p]articularly in the later 1970s, no simulation was necessary since Runway 29 provided the abnormal conditions called for because of the tree growth." Hughes Affidavit at 4.

The record regarding the County's use of the airspace over defendants' properties is largely undisputed. All the evidence offered suggests that, since the WCA's opening in the late 1940s, aircraft taking off and approaching runway 11/29 used a roughly 3–degree glide path. This use, unquestionably open and visible, was no less adverse and continuous for substantially more than 15 years. The progress of defendants' trees into the clear zones slowly forced aircraft to change their approach paths. Isolated trees penetrating the 20:1

clear zone between 1949 and 1964 caused pilots to make minor adjustments in their approach paths.

Defendants argue that the growing numbers of trees inside the clear zones between 1949 and 1970 defeat the County's claims of a fifteen-year period of uninterrupted use. As we noted earlier, this does not necessarily follow. The crucial issue is the exact point in time at which the trees began interfering with the County's use of this airspace, causing aircraft to deviate from their normal 3–degree glide paths such that use would be considered interrupted. Plaintiff has offered undisputed evidence from pilot affidavits suggesting that this occurred at some time during the late 1970s. The NOAA charts and FAA correspondence offered by defendants do not themselves create a disputed issue of fact contradicting the pilots' statements.

The charts show scattered tree penetrations into the clear zones as early as 1949 which by 1970 formed a band extending across the width of the 20:1 clear zone, including certain trees reaching up to forty feet into the clear zones. Defendants infer from the charts that the trees interrupted the County's use of runway 11/29's approach path and clear zones by this time. On the record, the court, however, has no basis on which to say this inference can be reasonably drawn for the approach path.

Trees clearly encroached upon the clear zones. However, this fact does not alone speak to the point in time when they interrupted the County's use of runway 11/29's glide path. Defendants have offered no evidence to show that County's use of the 3–degree glide path for runway 11/29, the prescriptive period for which expired by the mid–1960s, suffered anything more than small deviations due to trees before the late 1970s.

Defendants note the existence of a single tree, identified in a 1974 photograph, obstructing the 3–degree glide path for runway 11/29. This is not disputed by the pilots' affidavits. Pilots did not deny making minor adjustments in their glide paths for tree growth prior to the late 1970s. What they stated unequivocally, however,

was that the trees did not significantly interfere with their 3–degree approach until the late 1970s. Even inferring that a single tree standing in the glide path in 1974 substantially obstructed its use, the County's avigation easement would have matured some ten years earlier.

While the County has offered clear evidence showing that tree growth posed substantial obstacles by the late 1970s, defendants have proffered no evidence showing that the trees which were in the clear zones by 1970 caused anything more than slight changes in approach to runway 11/29. Showing that trees reached into the clear zones by a given number of feet does not necessarily show that they altered the glide path of incoming or outgoing aircraft. The FAA warnings, prior to the early 1980s, noted penetrations into the clear zones. Again, however, this does not show whether aircraft were actually forced off their 3–degree glide path or not.

Without more, defendants have not placed the moment of substantial interference with flight operations, and hence the easement requirement of uninterrupted use, for runway 11/29 into dispute. We conclude that the County has demonstrated a fifteen-period of open, visible, uninterrupted, and adverse use, beginning sometime in the late 1940s when the runway first opened for use and expiring at latest during the mid–1960s, sufficient to establish an avigation easement for the approach path of runway 11/29.

### 3. The Genus of Flight Easement Acquired

■ Defendants suggest that any easement acquired by the County in an earlier age of flight would be based upon use significantly different from the use proposed today for runway 11/29, use which now includes jet aircraft. Under Connecticut law, "use" of a right-of-way easement "frequently involves the amount of traffic over the easement or alterations to the land to make it passable." *Center Drive–In Theatre, Inc. v. Derby*, 166 Conn. 460, 465, 352 A.2d 304 (1974).

Courts have found avigation easements lacking because the nature of the usage had changed so significantly that the easement proposed bore little resemblance to the easement previously acquired. In *Petersen v. Port of Seattle*, 618 P.2d 67, the court, while recognizing the existence of avigation easements, determined that the easement acquired was by much smaller aircraft making far fewer flights. *Id.* at 71.

The facts here, however, suggest otherwise. Individuals associated with the operations of the WCA and pilots who have used runway 11/29 over the years state that the types of aircraft that used 11/29 in earlier periods, primarily lighter, small and medium-sized aircraft, are quite similar to those that used the runway in the 1970s, 1980s, and today in terms of rates of descent and flight characteristics. *See, e.g.,* Clemow Affidavit at 2; Doak Affidavit at 2–5; Graber Affidavit at 6; Hornbech Affidavit at 3; Hughes Affidavit at 5; Lewis Affidavit at 3; Soliman Affidavit at 3; Watts Affidavit at 3–4.

The County's easement is likewise unaffected by major changes in the volume of aircraft operations. The only evidence offered on this subject shows that airport operations have not differed dramatically since the 1960s, except to the extent that total operations, after peaking in the late 1960s, have apparently retreated back to the levels prevalent in the early 1960s.

Naturally, the number of daily flights using runway 11/29 varies with the day's weather conditions and volume of air traffic. Graber Affidavit at 4. However, WCA personnel noted that overall airport operations have remained relatively constant over the years, with runway 11/29 representing an estimated 40% of the WCA's operations. *Id.* Pilots have concurred, observing that runway 11/29's use has been relatively constant between the 1950s and 1970s. *See, e.g.,* Watts Affidavit at 4.

When the wind conditions were appropriate, as many as 80 landings and takeoffs occurred daily on runway 11/29 from the 1950s through the 1970s. *Id.* One pilot

stated that use of the runway dropped off slightly during the 1980s as interest in smaller private planes decreased. *Id.* However, airport personnel have said that use, although lower than in years past, remained constant from 1986 to the present. Russell Affidavit at 4.

This anecdotal evidence is supported by undisputed quantitative facts. In 1964, total airport operations numbered 202,129. They peaked in 1969 at 281,735 and dropped off to 255,232 by 1973. By the 1980s, total flights had leveled off with 203,271 in 1980 and 202,885 in 1984. Graber Affidavit at 4. Based on this evidence, not contradicted by defendants, we must conclude that the volume of air traffic passing through runway 11/29's approach path remained basically steady between 1960 and 1984, though peaking somewhat in the late 1960s.

Thus, no evidence exists in the present record to support the notion that the avigation easement acquired by the County in the past would differ substantially from the easement desired by the County today. The nature of aircraft using runway 11/29, primarily smaller and lighter planes, has changed little over the years. There has been no showing that more than one approach path is used for runway 11/29.

The advent of jet aircraft, a notable shift in the character of planes using the WCA, does not alter our conclusion that the easement sought by the County today does not materially differ from the avigation easement earlier acquired. Any easement established by the County during the 1960s would have followed the blossoming of jet aircraft in the 1950s. Their use would be included within the County's easement.

Moreover, pilots have stated that today's jets are quieter than the earlier models using the WCA between 1960 and 1980. *See* Clemow at 2–3; Doak Affidavit at 5. Since current jet aircraft are less noisy than their predecessors, the avigation easement sought, less burdensome today on defendants than it had been in days past, more closely resembles the original easement that was established.

Further, even if we assume that an easement for use of jet aircraft had not been originally established, such an evolution of the County's avigation easement would have been established by the early 1980s, once the 15–year prescriptive period had run. Consequently, we conclude that the County's avigation easement, acquired at the latest during the mid–1960s, is not markedly different from the easement proposed today.

### 4. Where The Easement Ends: Certainty of Boundaries

■ Defendants further argue that the court cannot recognize the acquisition of any easements by the County because its use has not established their boundaries with any reasonable certainty. We conclude, however, that the avigation easement sought by the County has boundaries of reasonable degree of certainty.

The typical approach to runway 11/29 begins from the traffic pattern altitude of 1500 feet above the ground. On final approach, pilots seek to maintain a constant descent along a 3–degree glide slope. Doak Affidavit at 7; Soliman Affidavit at 5. It was not until the late 1970s or early 1980s that the trees forced aircraft to deviate from their approach path in any significant way. *See* Clemow Affidavit at 4; Lewis Affidavit at 4. The record shows that, until the late 1970s, nothing more than minor variations existed in the 3–degree glide path used by aircraft landing on runway 11/29. Any avigation easement acquired by the County would have used airspace somewhere sitting on or slightly above a roughly 3–degree slope extending out from runway 11/29's threshold.

These parameters, with at most a few degrees of variation near the trees, are reasonably definite for purposes of defining the avigation easement associated with runway 11/29's use. Given the constant, and during the winter months often heavy, use of runway 11/29, anyone living beneath its approach path and gazing overhead at a passing plane would no doubt know with a reasonable degree of certainty

the airspace a plane was using while approaching the threshold of the runway.

In sum, we conclude that the County has demonstrated its continuous, uninterrupted use for a fifteen-year period which began during the 1940s when runway 11/29 first opened for use and expired, at the latest, some time before the mid–1960s.

E. *From Zone To Zone, Guides Through The Boundless Sky Thy Certain Flight* [12]*: Clear Zones And Avigation Easements*

■ By virtue of its acquisition of an avigation easement, the County also obtained the attendant rights of use necessary for its reasonable use and enjoyment. One of the rights incident to its avigation easement is a right to unobstructed clear zones. While avigation and clearance easements may involve distinct property rights, it seems clear that some sort of zone of safety is absolutely essential for the safe use and enjoyment of the County's avigation easement. Lewis Affidavit at 6.

Under Connecticut law, the "owner of an easement has all rights incident or necessary to its proper enjoyment." *Kuras v. Kope,* 205 Conn. 332, 533 A.2d 1202, 1206 (1987) (quoting *Peterson v. Oxford,* 189 Conn. 740, 745, 459 A.2d 100 (1983)); *see also American Brass Co. v. Serra,* 104 Conn. 139, 150, 132 A. 565 (1926). The court in *Kuras* recognized that use of an easement frequently involves alterations to the land to make the use possible. *See Kuras,* 533 A.2d at 1206 (citing *Center Drive–In Theatre, Inc. v. Derby,* 166 Conn. 460, 352 A.2d 304 (1974)). The *Kuras* test focuses on whether the desired acts are reasonably necessary to make effective the easement owner's enjoyment of that easement unless the burden on the servient estate is unreasonably increased. *See McCullough,* 1992 WL 24332, 1992 Conn. Sup. LEXIS 240.

The holding in *United States v. Brondum,* 272 F.2d 642, does not necessarily conflict with our conclusion. The court in *Brondum* did not deny the interrelationship between avigation easements and clearance easements. It simply held that the government's condemnation of property for the express purpose of acquiring one easement does not result, by implication, in its acquisition of the other easement. *Id.* at 644–45. The message in *Brondum* is clear: when government exercises its power of eminent domain, it must clearly identify the property rights it seeks to acquire.

In this case, the County is prevented from wielding its powers of eminent domain, the easement airspace being located in another state. Despite its somewhat unartful argument and inadequate briefing, it is apparent that the County is expressly seeking both avigation and clearance easements. Most importantly, Connecticut law recognizes that certain incidental rights essential for the use and enjoyment of an easement accrue to the easement's owner.

The presence of a buffer of airspace insures some margin of safety in an emergency. Wind turbulence, or wind shear, is particularly troublesome at low altitudes, in the severest conditions able to displace aircraft fifty feet in a few short seconds. Lewis Affidavit at 6. Clear zones are as unquestionably necessary to the safe operation of aircraft as shoulders are for road safety or channels are for ships approaching harbors.

The clear zones that accompany a flight path are not unlike the shoulders that line all roads. Each secures a measure of added safety for those travelling, be it on highways on the ground or in the sky. Courts, assessing the width of highways acquired by prescription, have found that the width of the easement acquired extends beyond simply the beaten track actually used. Prescriptive highway easements are defined to be such widths as are necessary

---

**12.** William Cullen Bryant, *To a Waterfowl,* which reads in part:

He, who, from zone to zone,
Guides through the boundless sky thy certain flight,

In the long way that I must tread alone,
Will lead my steps aright. . .

for their safe and convenient use. *See, e.g., Grubb v. Teale,* 265 Ala. 257, 262, 90 So.2d 727 (1956); *Nikiel v. City of Buffalo,* 7 Misc.2d 667, 165 N.Y.S.2d 592, 597 (N.Y.Sup.Ct.1957); *see also State ex rel. Game, Forestation & Parks Comm'n v. Hull,* 168 Neb. 805, 97 N.W.2d 535, 550 (1959); *Keidel v. Rask,* 290 N.W.2d 255, 258–59 (N.D.1980); *Lindsay Land & Live Stock Co. v. Churnos,* 75 Utah 384, 285 P. 646 (1929); *Yakima County v. Conrad,* 26 Wash. 155, 66 P. 411, 412 (1901); *see generally,* 76 A.L.R.2d 535 §§ 5, 8.

A New York court in *Nikiel,* in describing the width of a highway easement said:

While the width and extent of a highway established by prescription or use are generally measured by the actual use for road purposes, the easement is not necessarily limited to the beaten path or traveled tract. It carries with it the usual width of the highway in the locality or such width as is reasonably necessary for the safety and convenience of the travelling public and for ordinary repairs and improvements. A highway established by user includes the traveled tract and whatever land is necessarily used or is incidental thereto for highway purposes.

*Nikiel,* 165 N.Y.S.2d at 597; *see also Grubb,* 265 Ala. at 262, 90 So.2d 727. Requiring highway easements to be of widths reasonably necessary for their safe and convenient use in this respect parallels Connecticut law on the boundaries of prescriptive easements.

Recognizing the County's practical need for clear zones to reasonably enjoy its avigation easement will not unnecessarily burden the defendants. To some degree, permitting plaintiff to maintain a clear zone for aircraft using its runway will entail removing trees, or their tops at least, from defendants' properties. However, removal of the obstructing trees does not effective-

ly or unreasonably preclude defendants from enjoying use of their properties.

■ Moreover, an easement is not invalid simply because it burdens the servient estate; all easements do this to some extent by definition. Use of an easement must be reasonable and should be as limited a burden on the servient estate as the nature and purpose of the easement will allow. *Kuras,* 533 A.2d at 1206.

Overflights of defendants' properties will be significantly safer if planes have adequate clear zones, removing the need for pilots to use riskier techniques like "chop and drop" landings and steeper angles of descent.[13] The benefits of increased safety accrue not only to the passengers of aircraft but also to the property owners situated beneath the approach zone.

The topping of trees, perhaps upwards of one hundred or so, is obviously an unfortunate loss. Encouraging reforestation of the land enriches us all, adding to the quality of our lives and the aesthetic quality of our environment. One exception to this benefit is when those trees are situated adjacent to an airport's runway. One pilot, while overstating the point, highlighted this reality when he said, "Trees are beautiful but they can be killers to aircraft." Bennett Affidavit at 2. Runway 11/29's use predates the existence of many, perhaps even most, of these trees.

Defendants have made no showing that clearing the obstructing trees from the clear zones will undercut dramatically the respective uses of their properties as nursing home facilities, residences, a school, a road, and an investment opportunity.[14] Moreover, substantial numbers of trees will remain untouched on defendants' properties partially screening the airport and contributing to the area's natural beauty.

---

**13.** The term "chop and drop" refers to a landing technique used by pilots to clear obstructions in which the obstructions are cleared, power to the plane's engines is cut (the chop), and the plane loses altitude rapidly (the drop) until it lands on the runway. *See* Soliman Affidavit at 5–6.

**14.** Of course, the closing of the airport, which appears to be a devout wish of all of the WCA's neighbors, would improve the quality of life for those living nearby who must suffer the daily march of commerce overhead. And the continued growth of the trees could help accomplish that end.

In the final analysis, the rights of both holder of an easement and the owner of the servient estate are relative, each limited by the other's reasonable enjoyment. *Kuras*, 533 A.2d at 1207. Limiting the clear zones to the airspace reasonably necessary for the safe operation of aircraft using runway 11/29 insures that defendants will not be unfairly burdened by recognition of a clearance easement incident to the County's avigation easement.

We note that at least one court has touched upon the interrelation between avigation and clearance easements, seemingly reaching a different conclusion. In *Jefferson County v. Farris*, 476 S.W.2d 457 (Tex.Civ.App.Beaumont 1972), the County attempted to condemn through its powers of eminent domain a "clear zone approach area," or clearance easement, for its airport. Local landowners sued the County in a separate action for damages, claiming that the County had committed a taking through its persistent low altitude flights over their property.

The court in *Jefferson County* refused to hold that the County, by constitutionally taking a clearance easement, had by definition also taken an avigation easement. Citing *U.S. v. Brondum*, it rejected the notion that, for purposes of a taking, one easement necessarily includes the other. Quoting *Brondum*, the court held that the County, as condemnor, "ha[d] complete discretion in determining whether to take a clearance easement or to take an avigation easement." *Id.* at 459.

For purposes of this case, *Jefferson County* is not determinative since the County of Westchester is seeking both an avigation and a clearance easement over defendants' properties. The court in *Jefferson County* was concerned with insuring that when government wishes to condemn private property through its power of eminent domain, it does not condemn expressly for certain uses and implicitly for other uses. In other words, the state must be clear about nature of its condemnation.

We do not read the court's holding in *Jefferson County* to undermine the idea that, commensurate with establishment of a prescriptive avigation easement, a clear zone of some sort attaches by necessity, enabling aircraft to reasonably enjoy the avigation easement's use. To the extent it does imply this notion, we think that Connecticut law embraces a contrary view.

**F. *No Limits But the Sky?* [15]: Boundaries of the Clear Zones**

Having determined that an avigation easement was established by the County and that some clear zone attaches to this easement out of reasonable necessity, we must assess what the boundaries are for the clear zones reasonably necessary for the County to enjoy use of its avigation easement.

Despite the federalization of airspace, Congress expressly guarded the ability of landowners to pursue state law remedies for wrongs associated with the use of their property. The Federal Aviation Act of 1958, 49 U.S.C.App. §§ 1301 *et. seq.*, provides that "[n]othing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute." 49 U.S.C.App. § 1506. It is under the aegis of this provision that the County brought its claims for prescriptive easement and nuisance.

We have held that Connecticut easement law grants the County the clear zones reasonably necessary for the enjoyment and safe use of its avigation easement. The key question that remains is what are the actual boundaries of a clear zone reasonably necessary under Connecticut law to safely exercise the County's avigation easement. If we follow the FAA's guidance, we would conclude that the clear zones necessary for safe operation of aircraft are those specifically identified in the FAA regulations as prerequisites for federal aid for airport projects.

The navigable airspace of the United States specifically includes "airspace needed to insure safety in take-off and landing of aircraft." 49 U.S.C. § 1301(24). There is little doubt that clear zones fall within

**15.** Miguel de Cervantes, *Don Quixote de la Mancha*, Pt. I, bk. III, ch. 3.

the category of airspace needed to insure safe flight operations, and thus are incorporated within the navigable airspace.

The Federal Aviation Act of 1958 invests the FAA with broad powers to foster air safety including the power to regulate the use of navigable airspace and prescribe air traffic regulations governing the flight of aircraft for the protection of persons and property on the ground. *Flowers Mill v. United States,* 23 Cl.Ct. 182, 185 (1991) (citing 49 U.S.C.App. § 1348(c)). Pursuant to this statutory authority, the FAA promulgated Part 77 of the Federal Aviation Regulations concerning "Objects Affecting Navigable Airspace." *See id.* Courts have held that federal regulation of the navigable airspace is so extensive as to evidence an intent by Congress to preempt this field to insure uniformity in the interest of safety. *See Allegheny Airlines,* 132 F.Supp. at 881.

■■■ The FAA, however, does not possess the authority to prohibit or limit proposed construction it deems hazardous to air safety. *Flowers Mill,* 23 Cl.Ct. at 186, 188–89; *see also Kupster Realty Corp. v. New York,* 93 Misc.2d 843, 404 N.Y.S.2d 225 (1978). As a result, the federal government has not fully preempted a state's rights to regulate the navigable airspace. *Id.*

If a conflict exists between FAA regulations and Connecticut easement law over what airspace is reasonably necessary to insure safe air transportation, we must resolve which law governs our determination of the boundaries of the clear zones that attach to the County's avigation easement.

The specifications of clear zones—incorporated within the "airport protection privileges" defined by Connecticut's aeronautics statutes [16]—that are necessary for safe approaches to runways has received scant attention under Connecticut law. The term

"clear zone" is defined by § 15–74(a) to mean "an area extending for up to one-half mile from the end of the runway on a public airport and designated by the commissioner of transportation as a clear zone in accordance with regulations adopted by him." Conn.Gen.Stat. § 15–74(a).

Connecticut statutes represent only general statements about the importance of clear zones for safe air operations. The most detailed statement on clear zones is found among agency regulations regarding "approach standards" for commercial airports. The regulations state:

> The entire landing area shall be suitable for safe operations of aircraft under normal wind conditions. The landing area shall have approaches to all landing strips permitting a glide ratio of at least twenty to one and a transitional surface of at least seven to one.

Regs., Conn. Agencies § 15–41–31(d). Under this regulation's more general command to insure the safe operations on a particular landing area, only two specific approach zones are identified, a 20:1 glide ratio and a 7:1 transitional surface.

No mention is made of the other surfaces defined by FAA regulations. Moreover, we are not certain whether "glide ratio" refers to the actual flight path to be used by aircraft while landing or the 20:1 clear zone in the FAA regulations. The Connecticut regulation concerning the 20:1 glide ratio is also silent as to the width of the approach zones it identifies. This could produce a dramatic difference in the boundaries of the clear zones, and thus in the number of trees occupying them.

Connecticut law requires municipalities receiving federal aid for airports to comply fully with federal laws and any rule or regulations governing receipt of such aid. *See* Conn.Gen.Stat. § 13b–50 (1990). Thus, public airports in the state receiving feder-

---

**16.** "Airport protection privileges" are defined under Connecticut law to mean "easements through or other interests in air space over land or water, interest in airport hazards outside the boundaries of airports ... and other protection privileges the acquisition or control of which is necessary to insure safe approaches to the landing areas of airports ... and the safe and effi-

cient operation thereof." Conn.Gen.Stat. § 15–34(9). Before condemning the property needed to insure safe approaches to airport landing areas, the Commissioner of Transportation must establish and publish standards which he has adopted that govern the determination of what property interests are necessary for safe aircraft operations. *See* Conn.Gen.Stat. § 15–73.

al airport aid must secure the various clear zones specified in the FAA regulations. This conformity with FAA regulations on clear zones, however, only applies to airports receiving federal funds, and merely orders these airports to comply with the rules the FAA says they must comply with in order to receive federal funds. It does not speak directly to the clear zones that Connecticut deems reasonably necessary to guarantee the safe operations of aircraft, and none of the parties has offered any evidence of what clear zones Connecticut considers necessary for safe aircraft operations.

The commissioner of transportation is charged with the duty of formulating an airport approach plan for each publicly-owned airport in the state. Among other things, the plan must detail any potential airport hazards and the measures needed to protect the airport's approaches. In creating a plan, the commissioner "may obtain and consider the views of the agency of the federal government charged with the fostering of civil aeronautics as to the aerial approaches necessary to safe flying operations at the airport." Conn.Gen.Stat. § 15–90.

Section 15–90's implications cut two ways. The fact that the Commissioner retains the discretion to designate clear zones smaller than FAA standards undercuts the idea that the FAA regulations preempt a state's ability to define its own clear zones. However, the Commissioner, while not compelled to follow FAA guidelines in formulating the airport approach plan, is certainly directed to consider the FAA's guidance on what clear zones are necessary for safe airport operations.

While it is by no means clear from its laws and regulations, we conclude that Connecticut would follow the FAA's determination as to the clear zones reasonably necessary for the safe operation of aircraft. It may be that Connecticut regulations exactly mirror the FAA-defined clear zones, but simply use a different term to identify the 20:1 clear zone.

At the very least, the FAA-defined clear zones are binding on all airports in Connecticut that participate in the airport aid program and provide guidance for approach plans for all public airports in the state. We find that, while not generally bound to enforce the FAA clear zones or defer to the FAA's institutional expertise in the area of air safety, Connecticut would agree that the clear zones necessary for safe air operations are those identified in the FAA regulations.

### G. Out of Acorns, Do Mighty Easements Grow?: Defendants' Counter-Easements

▪ Our finding that the County has established a prescriptive avigation easement to the airspace above defendants' properties does not end our inquiry. Defendants claim that even if the County acquired such an easement in years past, it no longer retains any rights of use in this airspace because the trees occupation of the clear zones has reestablished their rights to the airspace by reverse prescription.

In assessing the arguments regarding the counter-easement claims, we must be clear as to the prescriptive easement acquired by the County and the counter-easements sought by defendants. We have held that the County has prescriptively acquired, as a matter of law, an avigation easement for its use of the 3–degree glide path connected to runway 11/29. The defendants' counter-easement claim seems to represent a claim to two distinct but related bodies of airspace, the airspace for the County's avigation easement and the airspace constituting the clear zones. We shall examine the defendants' claim to each zone of airspace individually.

The criteria for determining whether any defendant has reacquired rights to the airspace are identical to those the County met in establishing its easements initially. Each defendant must show open, visible, adverse, continuous use for a 15–year period. *Klar Crest Realty*, 190 Conn. 163, 459 A.2d 1021.

As against the County's avigation easement, the trees' use of the airspace ripens into adverse use only after they begin to

substantially interfere with the County's use of its glide path. *See Kelly v. Ivler,* 187 Conn. 31, 450 A.2d 817; *see also Kitzinger v. Gulf Power Co.,* 432 So.2d 188 (Fla.Dist.Ct.App. 1st Dist.1983).

*Kitzinger* involved a power company's easement allowing it to string electrical lines across a property. The power company sought an injunction to force the removal of the Kitzinger's house because it encroached into the safety zone that would parallel certain power lines once they were hung. The court in *Kitzinger* stated that:

> Since the servient tenant, as long as he does not interfere with the right of user, may use his land in any manner he desires, an act which serves to start the prescriptive period in his favor must be one clearly wrongful as to the owner of the easement. This requires that the use of the land by the servient tenant must be one which is incompatible or irreconcilable with the authorized right of use. Thus, the erection of permanent structures ... or other obstructions seriously interfering with the right of use, are sufficient to extinguish the rights.

*Id.* at 191 (quoting 3 Powell, The Law of Real Property ¶ 424 (1981)). Thus, defendants trees are not adverse to the County's avigation easement until their obstruction of the clear zones is clearly inconsistent with the County's use of the airspace. *Id.*

Defendants' easement claim to the clear zones airspace becomes adverse immediately once a tree grows into a given portion of the clear zone. Once a tree occupies a particular part of a clear zone, that airspace no longer serves as a safety buffer for aircraft. This adverse use, however, exists only for the airspace actually occupied by the trees.

As we noted earlier, the record indicates that the trees grew into serious obstructions in the late 1970s or early 1980s. The 15–year prescriptive period for defendants' reverse easement claim to the glide path airspace begins at some point during these years. While we cannot identify the exact year when this occurred, it matters little for our analysis. Even assuming that the trees substantially encroached upon the clear zones by the late 1970s, defendants' reverse easement claim was uprooted when the County's commenced its action in 1990, before the required fifteen-year prescriptive period had expired.

Further, the *Kitzinger* court noted that a clearer showing of adversity is required to extinguish an easement than to create one by prescription. *See id.* at 192. This heightened burden on defendants to show the point in time when their trees materially impaired the ability of aircraft to use runway 11/29's approach path would only underscore our holding. The affidavit testimony of various pilots represents the only evidence directly addressing when the trees became a serious obstacle to use of the 3–degree glide path. None of the pilots indicated that before the late 1970s the trees caused anything more than minor adjustments to the approach to runway 11/29. Thus, defendants' prescriptive easement claim to the glide path's airspace must fail.

The *Kitzinger* court recognized the power company's right to remove obstructions to its easement, including encroachments upon the safety zones surrounding power lines. However, it refused to order removal of the house since it represented only a theoretical interference with power lines not yet constructed, *i.e.* not yet a clear and present interference. *See Kitzinger,* 432 So.2d at 193.

Defendants' trees, however, stand on vastly different ground. They are unquestionably a clear and present interference with the County's use of runway 11/29's approach path. There are over one hundred trees penetrating the 20:1 and 7:1 clear zones, and they have already reduced runway 11/29's usable tarmac by over 1000 feet. They no doubt stand as a clear and present interference.

Connecticut law obliges the owner of the servient estate—here the defendant landowners—"to refrain from doing or suffering something to be done which results in an impairment of" the easement owner. *Kelly v. Ivler,* 450 A.2d at 823 (quoting *Carrig v. Andrews,* 127 Conn. 403, 407–08, 17 A.2d 520 (1941)).

*Kelly v. Ivler* involved an action to compel the removal of a fence erected by a property owner that allegedly encroached upon the plaintiff's easement. The court, noting an earlier decision, stated that an obstruction "erected within the boundaries of an easement so as to constitute a nuisance, was abatable 'if it materially interfered with [the] reasonable enjoyment of the easement, or rendered that enjoyment less beneficial or convenient than before its erection.'" *Id.* 450 A.2d at 824 (quoting *Blanchard v. Maxson,* 84 Conn. 429, 436, 80 A. 206 (1911)).

If the servient tenant's use has not reached the point of materially interfering with the use of the easement, the adversity requirement for prescriptive easements has not been met, and the 15–year prescriptive period has not yet commenced. There is no basis to infer that the single tree identified by defendants as interfering with the glide path in 1974 seriously interfered with aircraft approaches. Pilots testified that brief adjustments were necessary, causing no more than small increases in the angle of the glide path. Nothing indicates that one tree was incompatible with the County's basic approach to runway 11/29. Hence, defendants' claim of a counter-easement to the glide path airspace fails to meet the requirement of adversity for a 15–year period.

 Their claim to the clear zones' airspace, however, stands on a different footing. For this aspect of their claim, occupation of airspace immediately satisfies Connecticut's prescriptive easement requirements. A tree that has reached airspace inside a clear zone is indisputably open and visible. Further, unless it is later cut, that tree's occupation will be continuous and uninterrupted. And such a tree is unquestionably adverse; its mere existence in the airspace destroys the County's ability to use the empty airspace as a safety buffer.

Defendants' easement claims, however, can succeed only to the extent that the trees occupied the clear zones for the required 15–year prescriptive period. The County commenced suit in February 1990. Therefore, defendants can acquire prescriptive easements for those trees (and any other obstructive objects) that occupied the clear zones before February 1975. Since the other easement criteria have been met, the trees (and other objects) occupying runway 11/29's clear zones have acquired a prescriptive easement, as a matter of law, over the airspace they occupied as of February 1975, fifteen years before the County filed suit.

This raises a difficult problem for the defendants, and one most likely impossible to answer with any exactness. To establish an easement to the clear zone airspace under Connecticut law, the boundaries of that easement must be defined with a reasonable degree of certainty. Defendants reacquiring, or reaffirming, their right to the clear zone airspace to the extent it was occupied by their trees in February 1975 does not say what height each tree attained by that date. This is a factual issue that is impossible to resolve since no NOAA charts or any other evidence exists to fully establish the heights of the trees in February 1975.

A photogrammatic analysis completed by defendant the Convent of the Sacred Heart includes some evidence of tree heights from a 1974 photograph. This survey identifies the heights of six trees as of 1974, although its margin of error is 12 feet and identification of two individual trees was uncertain. From this incomplete information, we cannot determine the tree heights in 1974 with any certainty nor the degree of encroachment into the clear zones at this point. The only other solution we can propose is to recognize the defendants' easements for the tree heights as of 1970, the date of the NOAA chart nearest in time to 1975.

## H. *Hurt Not The Trees*[17]*: Laches*

 Finally, defendants claim that the County is barred by the doctrine of laches

---

**17.** *The Revelation of St. John the Divine,* 7:3, which says, "Hurt not the earth, neither the sea, nor the trees."

from bringing an action to establish a prescriptive easement to their airspace. They argue that the FAA's repeated warnings about the severity of the tree obstructions to runway 11/29 prevent the County from first asserting its legal rights in 1990. According to defendants, the County was put on notice of the tree problem in 1969 and resisted urgent warnings by the FAA for some 15 years. Defendants contend that they should not be allowed to pursue legal action at this late date.

To make out a claim for laches under Connecticut law, defendants must meet two criteria: inexcusable delay in asserting a claim and prejudice to the defendants from this delay. *Haggarty v. Parniewski*, 11 Conn.App. 37, 525 A.2d 984 (1987). A period of delay starts when the plaintiff knew or should have been aware of the wrong on which it later commenced suit. *I-291 Why? Ass'n v. Burns*, 372 F.Supp. 223 (D.Conn.1974), *aff'd*, 517 F.2d 1077 (2d Cir.1975).

Defendants contend that the County was on notice as early as 1949 when the first NOAA obstruction chart was compiled revealing trees inside runway 11/29's 20:1 clear zone. The WCA received NOAA charts in 1963, 1970, 1981, and 1990, all showing tree obstructions in the clear zones. By 1979, the WCA possessed actual knowledge of the problem when it was prevented from installing a visual approach slope indicator ("VASI") system for runway 11/29 by interference of trees with the system's 3–degree slope.

Beginning in 1981 and continuing until the FAA ordered the displacement of the runway in 1988, the WCA received direct and repeated warnings from the FAA about the problem of tree obstructions in runway 11/29's clear zones. In 1981, the FAA recommended removal or topping of the offensive trees. *See* Defendants' Exhibit 14. In 1984, the FAA again raised concerns about tree encroachments. In response, the WCA issued a NOTAM advising pilots of tree obstructions and suggested steeper approaches to insure aircraft safety. Despite repeated FAA requests between 1984 and 1988 and directions to formulate a plan of action to remove the obstructions, the WCA delayed action.

WCA responds that the actual height of the trees is difficult to discern from the air and tree growth into the clear zones was a slow process, imperceptible to an observer. The County's argument, the legal equivalent of "I cannot see the forest for the trees" is both weak and unconvincing. The FAA specifically and repeatedly warned the County about tree obstructions. The County issued a NOTAM in 1984, nearly six years before it finally commenced suit.

The record is replete with evidence showing that the County was told of tree obstructions as early as 1969, and possessed actual knowledge by the 1979, at the latest. Through the 1980s, the County callously ignored express FAA warnings that the trees represented a hazard to navigation. We have little doubt that nine years of inaction, even stonewalling, after clear warnings by the FAA constituted inexcusable delay on the part of the County. However, we note two things. First, the FAA, a federal agency, did not seem to appreciate the limited power that a County has over property owners who are located outside the county, and indeed located in a different state. Second, we find no undue prejudice to any of the defendants from the County's delay.

Defendant Convent of the Sacred Heart states that during this period it completed a costly expansion of the Convent's facilities, including the addition of a new gymnasium. The tenor of the Convent's argument is that granting the County an easement will devastate its academic environment and result in the harsh removal of its estate trees, flag pole, and building chimneys. Greenwich King Street Associates contends that it purchased its property in 1986, and thus the County's delay, and the tree removals, will severely undermined the value of its investment.

On balance, we cannot say that defendants have been unfairly prejudiced. Years of County inaction allowed the trees to grow further into the clear zones. Defendants enjoyed the benefit of continued

and increased screening from the airport during this time. Had the County commenced this action any earlier, defendants' legal and equitable positions would have been weaker. The partial easement to the clear zones established by defendants before February 1975 would have been far smaller had the County commenced this action any earlier. Greenwich King Street Associates has not lost the investment potential of its property. Nothing in the record demonstrates a significant loss in the value of the real estate. Moreover, it was fully aware, or should have been, when it purchased the land that it abutted the WCA, and runway 11/29 specifically.

Despite the accumulated fears of the defendant landowners, recognizing the County's prescriptive avigation easement after years of delay will not produce the dire mixture of results they envision. The County gains use of the flight path it utilized until the late 1970s when the trees became a significant problem. The obstructions that existed on the defendants' properties (including the Convent's chimneys and flag pole) when this easement was established can remain at the heights they had achieved before 1975. Nothing prevents new construction or growth of foliage provided they do not exceed the height ceiling established when the avigation easement was established. At present, defendants are not unduly prejudiced and their laches defense accordingly fails.

I. *Who's Gonna Move The Trees?* [18] *: Relief*

Since defendants' trees now materially and substantially interfere with the County's use of its avigation easement, the County can seek to trim the offensive trees.[19] In Connecticut, "injunction is the proper remedy to stop interference with an owner's use and enjoyment of an ease-

ment." *Peckheiser v. Tarone,* 186 Conn. 53, 60–61, 438 A.2d 1192 (1982). Trimming trees occupying the clear zones does not follow the County's establishment of an avigation easement as a matter of right. However, it is generally granted unless removal would produce a severe hardship upon the defendants. *See Di Sorbo v. Grand Associates One Ltd. Partnership,* 8 Conn.App. 203, 512 A.2d 940 (1986). Defendants argue that trimming will destroy some of the trees. We acknowledge that possibility.

Despite the possible loss of trees on defendants lands that cannot be trimmed, we cannot say that the balance of equities tips in their favor. Many trees will remain on these properties, including those trees that occupied the clear zones by February 1975. A refusal to enjoin the further tree growth into runway 11/29's clear zones is likely to eventually shut down the runway's use entirely. This would place an extraordinary burden on the WCA to meet its air traffic demands and would surely raise the risks of loss to life and property to dangerous levels, particularly when weather conditions deteriorate.

The County's ability to cut back the offending trees is tempered by the counter-easement established by defendants to use of the airspace actually occupied by February 1975. The County is entitled to clear runway 11/29's clear zones to their condition as of February 1975. We recognize that this result leaves the County with something less than what it desired, unobstructed clear zones of FAA-defined dimensions. The County may have to permanently suffer the use of runway 11/29 with a partially displaced threshold. For this, the County has only itself to blame. Had it acted on the FAA warnings sooner, it would have cut off the defendants' counter-easement claims at a much earlier date,

---

**18.** S. Silverstein, "Hammock," *A Light in the Attic,* which reads:

> Grandma sent the hammock,
> The good Lord sent the breeze.
> I'm here to do the swinging—
> Now, who's gonna move the trees?

**19.** Given our decision regarding the County's acquisition of prescriptive avigation and clearance easements to the clear zones and approach path to runway 11/29 and our rejection of defendants' reverse easement claim, we need not reach plaintiff's claims of public nuisance or equitable servitude.

and preserved a larger portion of runway 11/29's clear zones.

To conclude, we find that the wisest and safest course is to grant the County a limited injunction to cut back, at its own expense, the trees occupying runway 11/29's clear zones to the heights they attained as of February 1975. To the extent, certain trees cannot be simply trimmed back without destroying them, the County shall be permitted to remove them completely but must compensate defendants for their loss. As a result, plaintiff's and the defendants' motions for summary judgment are granted in part and denied in part.

The final question, and the one perhaps most vital to all the parties, is precisely which trees should be removed or topped by the County. This is a difficult question, and one for which this court is ill-equipped to answer on the present record. No adequate judicial mechanism exist for determining which trees should be trimmed and the amount of trimming required as well as which trees must be cut down. Therefore, we shall appoint a special master to evaluate the evidence concerning the defendants' properties and submit a recommendation on precisely which trees should be topped and which trees require removal.

SO ORDERED.